09-4305-cv
*Nnebe v. Daus*

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

_____

August Term, 2010
(Argued: September 21, 2010;  Decided: March 25, 2011; Amended: March 30, 2011)
Docket No. 09-4305-cv

_____

JONATHAN NNEBE, ALEXANDER KARMANSKY, individually and on behalf
of all others similarly situated, KHARIRUL AMIN, EDUARDO AVENAUT, NEW
YORK TAXI WORKERS ALLIANCE, individually and on behalf of all others
similarly situated,

*Plaintiffs-Appellants*,

*-v.-*

MATTHEW DAUS, JOSEPH ECKSTEIN, ELIZABETH BONINA, THE NEW
YORK CITY TAXI AND LIMOUSINE COMMISSION, THE CITY OF NEW
YORK, CHARLES FRASER,

*Defendants-Appellees*.

_____

BEFORE:   McLAUGHLIN and HALL, *Circuit Judges*, and RESTANI, *Judge*.[*]

_____

_____

[*] Judge Jane A. Restani of the United States Court of International Trade, sitting by
designation.

Appeal from a judgment of the United States District Court for the Southern District of

New York (Sullivan, *J.*), granting the defendants' motion for summary judgment and denying the

plaintiffs' motion for class certification as moot.  We conclude that the district court properly

granted summary judgment to defendants with respect to the plaintiffs' claim that the City of New

York must provide a pre-deprivation hearing before it may suspend the licenses of taxi drivers who

have been arrested.  However, we conclude that the factual record is inadequate to permit

summary judgment with respect to the plaintiffs' claim that the post-deprivation hearing currently

afforded to drivers is insufficient to provide due process.  We also disagree with the district court's

determination that the New York Taxi Workers Alliance lacks standing.  AFFIRMED IN PART

AND VACATED AND REMANDED IN PART.

_____

> DAVID T. GOLDBERG, Donahue & Goldberg, LLP, New York, New York (Daniel L.
> Ackman, Law Office of Daniel Ackman, Esq., New York, New York, *on the brief*),
> *for Plaintiffs-Appellants*.
>
> SUSAN CHOI-HAUSMAN, Senior Counsel (Pamela Seider Dolgow, Mary M.
> O'Sullivan, *on the brief*), for Michael A. Cardozo, Corporation Counsel, New York,
> New York, *for Defendants-Appellees*.
>
> Kenneth Kimerling, New York, New York (Andrew H. Schapiro, Hannah Y.S.
> Chanoine, *counsel of record*, Mayer Brown LLP, New York, New York), for Asian
> American Legal Defense and Education Fund, *Amicus Curiae in support of
> Plaintiffs-Appellants*.

_____

HALL, Circuit Judge:

The named plaintiffs in this putative class action, brought pursuant to 42 U.S.C. § 1983, are

the New York Taxi Workers Alliance ("NYTWA" or "Alliance") and four New York City taxi

drivers whose licenses to drive yellow cabs were automatically suspended when they were arrested

on criminal charges. It is the policy of the City of New York ("City") and its Taxi and Limousine Commission ("TLC" or "Commission"), defendants-appellees here, immediately to suspend a taxi driver's license without a hearing if the charged offense is a felony or one of an enumerated list of misdemeanors, and to do so regardless of whether the offense occurred while the driver was on duty, in his cab, or somewhere else entirely. Once suspended, a driver is entitled to a post-deprivation hearing, but in practice taxi licenses are never reinstated unless and until the driver secures favorable termination of the charges against him.

The plaintiffs argue that drivers are entitled to hearings before their licenses are suspended, and, in the alternative, that the post-suspension hearings currently afforded are inadequate to comport with due process. We agree with the district court that no pre-suspension hearing is required, and affirm its judgment to the extent that it granted summary judgment to the defendants on that claim. However, we are unable to determine whether the post-deprivation hearing affords due process because we find that the record on summary judgment does not support the district court's finding (and the City's claim) that the hearing enables a driver to make a showing that "the charges, even if true, 'do not demonstrate that the licensee's continued licensure would pose a threat to public health or safety.'" *Nnebe v. Daus*, 665 F.Supp.2d 311, 318 (S.D.N.Y. 2009) (decision below) (quoting Decl. of Joseph M. Eckstein at ¶ 6).

Accordingly, we vacate and remand for further proceedings, including more detailed fact-finding regarding the scope and process of the post-suspension hearings. We also reverse the district court's ruling that the NYTWA lacks standing.

3

## BACKGROUND

I.    The TLC's summary suspension process

The TLC is established by the New York City Charter to regulate taxicabs in New York City.  Among the powers granted to the TLC by the Charter is the power to issue, revoke and suspend drivers' taxi licenses.  Charter Ch. 65, § 2303(b)(5).  The New York City Administrative Code authorizes the TLC to promulgate rules and regulations to enforce this power.  *See* N.Y.C. Admin. Code § 19-503.  The Code provides that the TLC may

> for good cause shown relating to a direct and substantial threat to the public health or safety and prior to giving notice and an opportunity for a hearing, suspend a taxicab or for-hire vehicle license issued pursuant to this chapter and, after notice and an opportunity for a hearing, suspend or revoke such license.

N.Y.C. Admin. Code § 19-512.1(a).

TLC Rule 8-16 implements one such summary suspension procedure.  The version of the rule in effect until December 2006, under which the named plaintiffs in this case were charged, provided that "[i]f the Chairperson finds that emergency action is required to insure public health or safety, he/she may order the summary suspension of a license or licensee, pending revocation proceedings."  In December 2006 — after the hearings that gave rise to the named plaintiffs' claims — section (c) was added to TLC Rule 8-16, stating that "the Chairperson may summarily suspend a license . . . based upon an arrest on criminal charges that the Chairperson determines is relevant to the licensee's qualifications for continued licensure," and providing that, at the post-deprivation hearing, "the issue shall be whether the charges underlying the licensee's arrest, if true, demonstrate that the licensee's continued licensure during the pendency of the criminal charges would pose a threat to the health or safety of the public."  TLC Rule 8-16(c).

4

Once a driver's taxi license is summarily suspended under Rule 8-16, the TLC must notify the driver of the suspension within five calendar days, and the licensee may request a hearing before the TLC or an administrative law judge ("ALJ") within 10 days of receipt of the notice of suspension. *See* N.Y.C. Admin. Code § 19-512.1(a); TLC Rule 8-16(c). The TLC must provide this post-deprivation hearing to the driver within 10 calendar days of receiving the request. *See* TLC Rule 8-16(c). The ALJ must issue a written recommendation that the Chairperson may accept, modify or reject, and the Chairperson's decision represents "the final determination with respect to the summary suspension." TLC Rule 8-16(e). The defendants acknowledge that the policy expressly stated in TLC Rule 8-16(c) essentially describes the process that was followed under the old version of the rule, and the plaintiffs raise the same objections to both the old and the current rule.

The New York State Division of Criminal Justice Services ("DCJS") keeps on file the fingerprints of all licensed taxi drivers. If a driver is arrested, the DCJS notifies the TLC of the driver's identifying information, the date and location of the arrest, the arrest charges, and the section of the penal code under which the licensee was arrested. The DCJS does *not*, however, provide the TLC with any of the factual bases or allegations underlying the arrest. The TLC maintains a list of offenses, including all felonies and numerous misdemeanors, for which it will summarily suspend a driver upon arrest. The current list of offenses is three pages long and is appended to this opinion for the convenience of the reader. *See* Appendix. Some of the included misdemeanors, such as third-degree assault, may involve violence, while many others, such as false advertising, giving unlawful gratuities, and unlawful assembly, do not. The TLC states that offenses are added to the list if, presuming the truth of the charges, "continued licensure during the pendency of the criminal charges would pose a risk to public health or safety." When the TLC

5

receives an arrest notification from DCJS, a TLC lawyer decides whether to suspend the driver based solely on whether the offense is included on the aforementioned list. The lawyer does not consider the underlying factual allegations, nor the licensee's driving record or prior criminal record.

At the post-deprivation hearing, the ALJ considers the same materials considered by the TLC lawyer. According to an affidavit supplied by Joseph M. Eckstein, the Deputy Commissioner for Adjudications for the TLC, "the likelihood of a licensee's innocence or guilt as to the subject charges is not at issue," and "[t]he hearing provides a licensee with the opportunity to, *inter alia*, deny that s/he was arrested; deny that s/he was charged with the particular offense(s) in the notice of summary suspension; or to argue or establish that the pending charge(s), even if true, does not demonstrate that the licensee's continued licensure would pose a threat to public health or safety." Eckstein Decl. ¶ 6. It is undisputed that the ALJs nearly always recommend continuing the suspensions during the pendency of criminal proceedings and that the Chairperson usually accepts the ALJ's recommendation.

In deposition testimony, TLC Chairman Matthew Daus was unable to recall how or when the informal, pre-2006 policy of summarily suspending drivers upon arrest was first adopted. The policy did appear in a manual given to ALJs, but the deputy chief ALJ, at his deposition, was unable to state when this section of the manual had been written, or by whom. TLC lawyer Marc Hardekopf, who represented the TLC at the suspension hearings in these cases, testified at his deposition that the percentage of suspended drivers who are ultimately convicted is "very low," and in no event more than one quarter.

The plaintiffs also adduced evidence that, as explained *infra*, they argue show that ALJs lack adequate decisional independence. On three occasions within a short span of time in

6

February and March 2006, ALJ Eric Gottlieb recommended that three drivers' licenses be reinstated because, in each case, he found an "overwhelming likelihood" that the drivers' cases would end in a "non-criminal disposition." ALJ Gottlieb's action prompted the following response in an e-mail from the deputy chief ALJ a few weeks later:

> Eric,
> [Name redacted] was arrested and issued a DAT[2] for leaving the scene of an accident that involved his taxi. Your [r]ecommendation that the suspension be lifted because he was issued a "DAT" and/or because you speculate that he will receive a "non-criminal disposition" was **improper**. Re-read the ALJ manual regarding summary suspension proceedings and the standard we are required to use. In the future if you believe a summary suspension should be lifted please call me and discuss the matter with me before mailing it out. Please call me at [number redacted]. I want to discuss this matter with you.
> Thanks
> Tom

(emphasis in original)

ALJ Gottlieb wrote the following e-mail in response:

> Tom,
> Just wanted to apologize once again for the mishap regarding the Summary Suspension cases. I value greatly the trust you have shown me in the past and I want to assure you that this will not happen again. I accept full responsibility for not handling this properly. If there is anything I can do to mitigate the fallout for you, please let me know.
> Thanks,
> Eric

ALJ Gottlieb testified at his deposition that he was worried that his improper recommendations would lead to his duties being modified or his transfer from Manhattan back to the TLC's Long Island City office, which he called "a very depressing environment." Tr. of Gottlieb Dep. at 89.

---

[2] Desk appearance ticket: "[A] written notice issued and subscribed by a police officer . . . directing a designated person to appear in a designated local criminal court at a designated future time in connection with his alleged commission of a designated offense." N.Y. C.P.L. § 150.10.

## II.    District court proceedings

Plaintiffs Jonathan Nnebe, Alexander Karmansky, Eduardo Avenaut, Khairul Amin, and the NYTWA brought this putative class action against the City of New York, the TLC, Daus, and other TLC officials in June 2006.  Each of the four named plaintiffs is a taxi driver whose license was suspended in 2005 or 2006 after an arrest.  Nnebe was charged with third-degree assault with intent to cause physical injury, Karmansky with first-degree criminal contempt and second-degree criminal trespass, Avenaut with third-degree assault with intent to cause physical injury, and Amin with second-degree menacing with a weapon and third-degree assault with intent to cause physical injury.  Each of the four was summarily suspended upon arrest, and each received a hearing in front of ALJ Frank Fioramonti, except for Avenaut, who did not request a post-deprivation hearing.   For the three who requested hearings, the outcome was in each case the same — Fioramonti recommended the continued suspension of the driver's license pending resolution of criminal proceedings, and Daus accepted the recommendation.  All four drivers eventually secured the reinstatement of their licenses when the relevant district attorneys' offices dropped the charges. The total period of suspension for each driver proved to be approximately three to four months.

In their putative class-action complaint, the plaintiffs alleged that: (1) the absence of a pre-deprivation hearing denied them procedural due process; (2) assuming no pre-deprivation hearing is required, the post-deprivation hearing provided is insufficient to provide due process because its scope extends no further than determining whether the driver was arrested for the crime charged; (3) the ALJs lack sufficient independence to provide unbiased adjudication; and (4) the TLC violated the City Charter by summarily suspending the lead plaintiffs before the current version of TLC Rule 8-16 was adopted.  The plaintiffs moved for class certification, and both sides moved for summary judgment.

8

In September 2009, the district court issued an opinion and order (1) dismissing the NYTWA as a plaintiff for lack of standing; (2) dismissing the TLC as a defendant because it is not a suable entity; (3) granting the defendants' motion for summary judgment; (4) denying the plaintiffs' motion for summary judgment; (5) declining to exercise supplemental jurisdiction over the plaintiffs' state law claims; and (6) denying as moot the plaintiffs' motion for class certification. *See Nnebe v. Daus*, 665 F.Supp.2d 311, 334 (S.D.N.Y. 2009).[3] The district court dismissed the TLC as a defendant on the grounds that an agency of the City of New York is not a suable entity in its own right. *Id.* at 320. It concluded that the NYTWA could not sue on behalf of its members because § 1983 creates a right of action "personal" to the injured party, *id.* (citing *League of Women Voters of Nassau Cnty. v. Nassau Cnty. Bd. of Supervisors*, 737 F.2d 155, 160 (2d Cir. 1984)), and that the NYTWA lacked organizational standing because it had not alleged more than an injury to its "abstract social interests," *id.* at 320-21 (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)).

Turning to the merits of the plaintiffs' procedural due process claims, the district court applied the familiar three-factor test of *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976).[4] *See*

---

[3] The district court construed some of the plaintiffs' claims pertaining to state law as substantive due process claims. *See Nnebe*, 665 F.Supp. at 330-32. On appeal, the plaintiffs state that they did not intend to bring any substantive due process claims, expressly disavow any such claims, and make clear that they wish to bring state-law claims directly (presumably under the district court's supplemental jurisdiction). Accordingly, we will not discuss the district court's substantive due process analysis and will not review any of the plaintiffs' claims in terms of substantive due process.

[4] This test requires a court to examine the following factors: "[f]irst, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute requirement would entail." *Mathews*, 424 U.S. at 335.

*Nnebe*, 665 F.Supp.2d at 322-23. The district court found that no pre-deprivation hearing was required and that the post-deprivation hearing provided was sufficient. *Id.* at 323-30. Evaluating the three *Mathews* factors, the court found that the private interest was "undoubtedly significant," but that the City's interest in "ensuring the safety of the taxi-riding public and maintaining the public's trust in the safety of taxis" counseled strongly against requiring a pre-deprivation hearing. *Id.* at 324-25. The court also found that the third factor, the risk of erroneous deprivation and the relative value of added process, weighed in favor of the defendants because "the very existence of a criminal proceeding is a reason to suspend a driver, as pending criminal allegations – even if later dismissed – implicate the TLC's interest as licensor." *Id.* at 325. Balancing these factors, the district court concluded that no pre-deprivation hearing was necessary. *Id.* at 325-26.

The court turned next to the plaintiffs' contention that "even if the lack of a pre-deprivation hearing were constitutional, the post-deprivation hearing is not because its scope extends no further than determining whether the plaintiff was actually arrested." *Id.* at 326. "Necessarily implicit in this argument," the district court wrote,

> is the contention that the government must prove more than the fact of a licensee's arrest before suspending him. As discussed below, however, due process does not require such proof. Moreover, it would be difficult, if not impossible, for the TLC to prove that a driver had actually engaged in the charged criminal conduct without interfering with the criminal investigation.
>
> As explained below, federal courts have held both (1) that an agency is entitled to suspend an employee on the basis of pending criminal proceedings against him, and (2) that because an agency may do so, a hearing that does no more than confirm the existence of such criminal proceedings does not violate the suspended employee's rights.

*Id.*

The district court relied upon three out-of-circuit cases to make this point: *Cooke v. Soc. Sec. Admin.*, 125 Fed. Appx. 274 (Fed. Cir. 2004) (unpublished disposition); *James A. Merritt &*

10

*Sons v. Marsh*, 791 F.2d 328 (4th Cir. 1986); and *Brown v. Dept. of Justice*, 715 F.2d 662 (D.C. Cir. 1983). *Nnebe*, 665 F.Supp.2d at 326-28. It found that each of these cases weighed in favor of a holding that "the existence of a criminal proceeding may justify governmental interference with a protected property right." *Id.* at 327. It also found that "[t]he conclusion that [p]laintiffs are not entitled to a full adversarial hearing before the TLC is bolstered by the third factor in the *Mathews* analysis: the value of additional procedures and the burden that such additional procedures would entail." *Id.* at 328. The court explained that "requiring the TLC to prove that each driver engaged in the charged conduct would unacceptably interfere with the parallel criminal proceeding" and expressed doubt that it could compel prosecutorial cooperation in such a hearing. *Id.* In addition, the district court found that a mini-trial on the charged conduct would impose too great a burden on the City's resources. *Id.*

The district court also addressed this Court's holding in *Krimstock v. Kelly*, 306 F.3d 40 (2d Cir. 2002) (Sotomayor, J.), where we stated that a post-seizure, pre-forfeiture hearing was required when the City of New York seized the vehicles of individuals charged with drunken driving. *See Nnebe*, 665 F.Supp.2d at 328-30. The district court found three significant distinctions between *Krimstock* and this case: (1) the government interest in *Krimstock* was primarily its financial interest in auctioning off the more expensive of the cars it seized, whereas the government interest in this case is the public confidence and trust in the TLC's judgment with respect to the licensing of drivers, *id.* at 329; (2) the risk of erroneous deprivation was greater in *Krimstock* because of the possibility that vehicles merely driven by arrested drivers but whose owners were innocent would be held until the end of civil forfeiture proceedings, *id.* at 329-30; and (3) the alternative procedure sought in *Krimstock* was more feasible because, unlike this case, the NYPD was a party to both the criminal proceedings and the civil forfeiture proceedings, and

11

"there was thus little difficulty in ordering the police to make an evidentiary showing to maintain the seizure of the car," *id.* at 330.

Separately, the district court rejected the plaintiffs' contention that their procedural due process rights were violated because the ALJs were biased or insufficiently independent, noting that the plaintiffs could have brought an Article 78 proceeding in New York State Supreme Court, which would have provided an adequate post-deprivation remedy to the extent that bias was a potential cause of deprivation. *Id.* (citing *Locurto v. Safir*, 264 F.3d 154, 174 (2d Cir. 2001)). Finally, to the extent that the plaintiffs sought to raise state-law claims directly, the district court dismissed them because it had dismissed all federal claims. *Id.* at 333-34.[5]

The plaintiffs timely appealed.

## DISCUSSION

### I.      Standard of review

We review a district court's grant of summary judgment *de novo*, and we apply the same standard as the district court. *See In re Bennett Funding Grp., Inc.*, 336 F.3d 94, 99 (2d Cir. 2003). To uphold the grant of summary judgment, we "must determine that there is no genuine issue of material fact, taking the pleadings, depositions, answers to interrogatories and admissions on file, together with any other firsthand information including but not limited to affidavits." *Id.* We review questions of standing *de novo*. *See Carver v. City of New York*, 621 F.3d 221, 225 (2d Cir. 2010).

---

[5] The district court also rejected certain other constitutional claims by the plaintiffs, including claims of insufficient notice of suspension and violation of their Fifth Amendment right against self-incrimination. *Nnebe*, 665 F.Supp.2d at 332-33. The plaintiffs do not pursue these claims on appeal, and we do not discuss them further.

12

II.    Standing of the NYTWA

Before we turn to the merits, we review the district court's determination that NYTWA lacks standing to bring this suit. Standing is "the threshold question in every federal case, determining the power of the court to entertain the suit." *Denney v. Deutsche Bank AG*, 443 F.3d 253, 263 (2d Cir. 2006) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)). To establish Article III standing, "a plaintiff must have suffered an 'injury in fact' that is 'distinct and palpable'; the injury must be fairly traceable to the challenged action; and the injury must be likely redressable by a favorable decision." *Id.* (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).

It is the law of this Circuit that an organization does not have standing to assert the rights of its members in a case brought under 42 U.S.C. § 1983, as we have "interpret[ed] the rights [§ 1983] secures to be personal to those purportedly injured." *League of Women Voters of Nassau Cnty. v. Nassau Cnty. Bd. of Supervisors*, 737 F.2d 155, 160 (2d Cir. 1984) (citing *Aguayo v. Richardson*, 473 F.2d 1090 (2d Cir. 1974) ("Neither [the] language nor the history [of § 1983] suggests that an organization may sue under the Civil Rights Act for the violations of rights of members")).[6] We are thus bound to agree with the district court that NYTWA cannot bring this action as the representative of its members.

However, nothing prevents an organization from bringing a § 1983 suit on its own behalf

---

[6] The plaintiffs argue that this rule is "contradicted by a raft of Supreme Court precedent" and "was effectively rejected by the Supreme Court in *Warth v. Seldin*." Appellants' Br. at 54. However, we reaffirmed the *Aguayo* rule in *League of Women Voters* nine years after *Warth* and have not since reconsidered it. Accordingly, we are bound by the implicit determination of prior panels that the rule survives *Warth* "until such time as [our prior decisions] are overruled either by an *en banc* panel of our Court or by the Supreme Court." *United States v. Wilkerson*, 361 F.3d 717, 732 (2d Cir. 2004).

13

so long as it can independently satisfy the requirements of Article III standing as enumerated in *Lujan*. *See Irish Lesbian & Gay Org. v. Giuliani*, 143 F.3d 638, 649 (2d Cir. 1998) (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 n.19 (1982)). The district court concluded that NYTWA lacked standing in its own right because it "put forward insufficient evidence to allow a reasonable fact finder to conclude that it has had to divert greater resources to more individualized services and away from . . . reform efforts." *Nnebe*, 665 F.Supp.2d at 321. Specifically, the court held that the evidence demonstrated that the association infrequently "counsels drivers whose licenses have been suspended pursuant to the challenged policy." *Id.* Furthermore, the district court stated that even if the association had demonstrated that counseling occurred with some frequency, it "ha[d] not identified the priorities on which it was unable to focus as a result of the summary suspension procedures." *Id.*

We disagree with the district court's analysis. The evidence supplied by NYTWA, while "scant," is not abstract. *Nnebe*, 665 F.Supp.2d at 321. The deposition testimony of NYTWA's executive director demonstrates that the Alliance has expended resources to assist its members who face summary suspension by providing initial counseling, explaining the suspension rules to drivers, and assisting the drivers in obtaining attorneys. NYTWA also makes an effort "to really explain the urgency [of the situation] to the criminal defense lawyer" so that the lawyer understands that the driver will be unable to work until the charges are resolved. Tr. of Desai Dep. at 11.

We have recognized that only a "perceptible impairment" of an organization's activities is necessary for there to be an "injury in fact." *Ragin v. Harry Macklowe Real Estate Co.*, 6 F.3d 898, 905 (2d Cir. 1993) (citing *Havens Realty Corp.*, 455 U.S. at 379). Even if only a few suspended drivers are counseled by NYTWA in a year, there is some perceptible opportunity cost

14

expended by the Alliance, because the expenditure of resources that could be spent on other activities "constitutes far more than simply a setback to [NYTWA's] abstract social interests." *Havens Realty Corp.*, 455 U.S. at 379. Furthermore, the Supreme Court has stated that so long as the economic effect on an organization is real, the organization does not lose standing simply because the proximate cause of that economic injury is "the organization's noneconomic interest in encouraging [a particular policy preference]." *Id.* at 379 n.20.

We recognize that some circuits have read *Havens Realty* differently than we read it in *Ragin* and have emphasized that "litigation expenses alone do not constitute damage sufficient to support standing." *Fair Hous. Council of Suburban Phila. v. Montgomery Newspapers*, 141 F.3d 71, 78-79 (3d Cir. 1998) (declining to follow our decision in *Ragin* because it goes too far in allowing standing); *see also Spann v. Colonial Vill., Inc.*, 899 F.2d 24, 27 (D.C. Cir. 1990) (to establish standing, an organization must show "concrete and demonstrable injury to [its] activities") (R.B. Ginsburg, J.). Nevertheless, *Ragin* remains good law in this Circuit. Moreover, even assuming *arguendo* that those circuits positing a narrower view of *Havens Realty* are correct, their decisions (which, like *Ragin*, arose in the context of the Fair Housing Act) were largely concerned with the capacity of organizations to "manufacture" standing by bringing a suit. *See Fair Hous. Council*, 141 F.3d at 79; *Spann*, 899 F.2d at 27.

For example, in *Fair Housing Council*, the plaintiff organization claimed "that it suffered palpable injury when it was forced to divert resources to investigation." 141 F.3d at 78. But "[t]he 'investigation' to which the [organization] refer[red] consisted of having its staff members review classified advertisements placed in [the defendant newspapers] on an ongoing basis for evidence of discrimination." *Id.* The Third Circuit found that the organization lacked standing to bring a Fair Housing Act against specific discriminatory ads because its alleged "investigation" "was not

15

motivated by the advertisements in this suit or by a complaint about advertising" and because "[t]he record . . . does not establish that the [organization] altered its operations in any way as a result of the allegedly discriminatory advertisements or diverted any of its resources to a bona fide investigation." *Id.*

This case, by contrast, is not an instance of "manufactured" litigation. The Alliance, far from trolling for grounds to litigate, has allocated resources to assist drivers only when another party — the City — has initiated proceedings against one of its members. And if NYTWA's suit proves successful, it will have secured a permanent benefit for itself, avoiding the need for further lawsuits on the claims presented here — unlike the organization in *Fair Housing Council*, which presumably could have continued to seek out new, discriminatory ads and bring additional suits as the representative of its members. The Alliance brings this suit so that when it expends resources to assist drivers who face suspension, it can expend those resources on hearings that represent bona fide process. That is an interest specific to NYTWA, independent of the interest of individual drivers in their licenses. NYTWA has thus shown that it has suffered "an 'injury in fact' that is 'distinct and palpable' . . .[,] fairly traceable to the challenged action[,] and . . . likely redressable by a favorable decision." *Denney*, 443 F.3d at 263. Accordingly, NYTWA has standing to bring this action on its own behalf.[7]

---

[7] The district court correctly dismissed the TLC as a party. It is well settled in this Court that agencies of New York City are not suable entities in § 1983 actions, and the TLC thus cannot be named as a defendant. *See Jenkins v. City of New York*, 478 F.3d 76, 93 n.19 (2d Cir. 2007). This is of no practical consequence, however, since the TLC must abide by any relief ordered against the City of which it is a non-severable part, and the plaintiffs concede this.

16

III.    Procedural due process

The Fourteenth Amendment requires that "No state shall . . . deprive any person of . . . property, without due process of law."  In a § 1983 suit brought to enforce procedural due process rights, a court must determine (1) whether a property interest is implicated, and, if it is, (2) what process is due before the plaintiff may be deprived of that interest.  *See Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 313 (2d Cir. 2002).  In this case, as the district court recognized, the answer to the first question is undisputed: "a taxi driver has a protected property interest in his license." *Nnebe*, 665 F.Supp.2d at 323 (citing *Bell v. Burson*, 402 U.S. 535, 539 (1971)).  We are called upon only to decide what process is due.

a.    Pre-suspension hearing

Due process does not, in all cases, require a hearing before the state *interferes* with a protected interest, so long as "some form of hearing is [provided] before an individual is finally deprived of [the] property interest."  *Brody v. Vill. of Port Chester*, 434 F.3d 121, 134 (2d Cir. 2005) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976)).  In other words, "due process is flexible and calls for such procedural protections as the particular situation demands." *Id.* (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)).  "*Mathews* is the test for both when a hearing is required (i.e., pre- or post-deprivation) and what kind of procedure is due . . . ." *Id.* at 135.  The "general rule" is that a pre-deprivation hearing is required, *id.*, but the *Mathews* inquiry "'provides guidance' in determining whether to 'tolerate' an exception to the rule requiring pre-deprivation notice and hearing," *Krimstock v. Kelly*, 306 F.3d 40, 60 (2d Cir. 2002) (Sotomayor, J.) (quoting *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 53 (1993)).

Weighing the three factors of the *Mathews* test — the private interest, the risk of erroneous deprivation, and the government's interest, *see supra* n.4 — we agree with the district court that

17

the City is not required to grant a driver a hearing before suspending his license because of an arrest. We understand that the private interest at stake here is enormous — most taxi drivers "rely on the job as their primary source of income" and "often earn the sole income for large families in a city where the cost of living significantly exceeds the national average." Amicus Br. at 4. The Supreme Court has repeatedly "recognized the severity of depriving someone of the means of his livelihood." *Gilbert v. Homar*, 520 U.S. 924, 932 (1997) (citing *Fed. Deposit Ins. Corp. v. Mallen*, 486 U.S. 230, 243 (1988); *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 543 (1985)). In *Gilbert*, the respondent, a police officer, was suspended without pay and without notice or a hearing after he was arrested on felony drug charges. *Id.* at 926-27. The Supreme Court, while recognizing the severity of the deprivation, also noted that the "the [s]tate has a significant interest in suspending, when felony charges are filed against them, employees who occupy positions of great public trust and high public visibility, such as police officers." *Id.* at 932. We agree with the district court that "[a]mong the most critical functions performed by the TLC are ensuring the safety of the taxi-riding public and maintaining the public's trust in the safety of taxis." *Nnebe*, 665 F.Supp.2d at 324. The plaintiffs and their amicus argue that "incidents in which a cabdriver harms a passenger are virtually unheard of," Amicus Br. at 7, and that the TLC has not "proffer[ed] evidence of a single actual incident involving injury to a passenger," Appellants' Br. at 31. But even if this is true, we think that in any given case, an arrest for a felony or serious misdemeanor creates a strong government interest in ensuring that the public is protected in the short term, prior to any hearing.

With the first *Mathews* factor (private interest) strongly favoring the plaintiffs and the third factor (government interest) strongly favoring the City, we turn to the second factor — "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if

18

any, of additional or substitute procedural safeguards." 424 U.S. at 335. In the predeprivation context, this factor tips the scales decisively in the favor of the City, because the risk of erroneous deprivation is mitigated by the availability of a prompt post-deprivation hearing. Put another way, the "risk of an erroneous deprivation" at stake when deciding whether a pre-suspension or post-suspension hearing is required is only the risk that a driver will lose the income he could have earned between the date of arrest and the date of the post-suspension hearing. Although we understand that even that loss can be deeply problematic for a taxi driver, we conclude that in the immediate aftermath of an arrest, when the TLC has minimal information at its disposal and the very fact of an arrest is cause for concern, the government's interest in protecting the public is greater than the driver's interest in an immediate hearing. Accordingly, no pre-suspension hearing is required.

b.      Post-suspension hearing

Normally, in a procedural due process case, it is the obligation of the court of appeals to set forth the minimum protections that must be afforded at a post-deprivation hearing, s*ee, e.g., Krimstock*, 306 F.3d at 69 ("Although we decline to dictate a specific form for the [post-deprivation] hearing, we hold that, at a minimum, the hearing must enable claimants to test the probable validity of continued deprivation of their vehicles, including the City's probable cause for the initial warrantless seizure."), and if the existing hearing is found deficient the district court then has considerable latitude to frame a decree with input from the parties and within the guidelines set by the court of appeals, s*ee id.* In this case, however, we cannot yet make these determinations because the evidence in the record is insufficient to establish that the post-suspension hearing the City describes to us is in fact the hearing that it offers. We therefore reserve judgment with respect to whether the summary suspension hearings satisfy the minimum

19

requirements of due process. To the extent that the district court granted the defendants summary judgment on the plaintiffs' claim that the post-suspension hearing is inadequate, we conclude for the reasons that follow that its judgment must be vacated and the case remanded for the taking of further evidence.

The City, and, to a lesser extent, the plaintiffs, have tended to frame the question on appeal to be whether the TLC must afford drivers a "mini-trial" on the criminal charges against them, and at that hearing allow drivers an opportunity to show they are likely to secure favorable termination of their criminal cases. That is not what troubles us. We agree with the district court that the City cannot be required to hold a hearing that functions as a preview of the criminal case. More to the point, we think that district attorneys and other prosecuting authorities cannot be compelled to participate in a hearing that would test the merits of their case in a civil deprivation proceeding brought by a separate government entity and that is at most tangential to the criminal case. Decisions of other courts, including New York's highest court, strongly suggest that important state policy interests weigh against requiring such participation. *See, e.g., People v. Chipp*, 75 N.Y.2d 327, 337-38 (1990) (defendant cannot invoke compulsory process at a pretrial hearing testing the suggestiveness of a lineup, in part because of the risk that the defendant could use such hearings to leverage favorable plea bargains or compromise ongoing investigations); *Brown v. Dep't of Justice*, 715 F.2d 662, 667-68 (D.C. Cir. 1983) (administrative hearings that precede trial on the criminal charges would "constitute improper interference with the criminal proceedings if they churn over the same evidentiary material") (quoting *Peden v. United States*, 512 F.2d 1099, 1103 (Ct. Cl. 1975)); *see also Brown v. City of New York*, 60 N.Y.2d 897, 898 (1983) (the City of New York and the district attorneys' offices within it are separate entities). Rather, what troubles us is that we do not understand what it is a driver may in fact attempt to show at the hearing the

20

City *does* offer.

> The City asserts that drivers may attempt to present evidence that
>
> they were not actually arrested; the offenses listed in the DCJS notice were incorrect; the charges had been reduced or dismissed; *or the regulatory standard was not met — the charges, even if true, did not demonstrate that continued licensure would pose a threat to public safety.*

Appellees' Br. at 33 (emphasis added). That standard, if it actually is the standard, may be well within the range of adequate due process protections. The problem is that the italicized language appears to be an oft-quoted nullity that in no way resembles a part of the standard ALJs must apply. The record basis for calling it the standard is scant — testimony and affidavits from City witnesses repeatedly recite, in conclusory terms, that a driver may attempt to make the italicized showing. And while there is little evidence that an ALJ is allowed actually to apply this standard, there is considerable evidence supporting the appellants' view that they may not. A former general counsel for the TLC testified that he has never heard of an instance of an ALJ discontinuing a summary suspension or making a recommendation to that effect. Several attorneys whose practices include representing taxi drivers corroborate this, and one states that he now declines to represent drivers at summary suspension hearings because he feels it is improper to accept money for a proceeding where "the result is not in doubt." Spevack Aff. at ¶5. Conversely, the City has never pointed to any evidence showing how a driver could prevail at a suspension hearing after an arrest for one of the offenses listed on the summary suspension chart. We are not convinced, therefore, that the City binds itself to the standard it says is in place.

Lest there be any misunderstanding about what has been argued to us, we emphasize that it is *not* the City's position that arrest for one of the offenses listed on the TLC's summary suspension chart is *per se* evidence that "the licensee's continued licensure would pose a threat to

public health or safety." We pressed the City about this question in particular at oral argument, asking whether the only showings a driver could attempt to make at the post-suspension hearing were: (1) that he was not charged with one of the crimes on the summary suspension list or (2) that he was not the person named in the arrest report. *See* Tr. of Oral Arg. at 14-15. The City replied that "they're entitled to bring in evidence . . . from their criminal cases to show, well, even in these cases if the facts are true, I don't pose a risk to public safety." *Id.* In response to that answer, we asked how a driver could make such a showing if there is a presumption that a arrest for a given offense indicates a risk to public safety. *Id.* at 15. The City reiterated that a driver could bring in his criminal complaint and argue that "these are the facts that are alleged in the criminal complaint . . . I wouldn't pose a risk to public safety." *Id.* The City's brief confirms its position that proof regarding the charged offense and proof regarding the regulatory standard are separate issues at the hearing.

The City, then, is not standing on an assumption that automatic continuance of a suspension — after a hearing at which only identity or offense can be disputed — is consistent with due process. The City's defense of the process it affords is premised on a contention that it provides drivers with a real opportunity to show that they do not pose a risk to public safety, arrests notwithstanding. The record on summary judgment, however, does not support the City's view of the facts. To the contrary, the record strongly suggests that, whether *de facto* or *de jure*, an ALJ is strictly prevented from considering anything other than the identity of the driver and the offense for which he was charged upon arrest.

Until we have a clearer picture of the scope of the summary suspension hearings, it is unnecessary and inappropriate for us to decide whether a hearing that does nothing more than confirm the driver's identity and the existence of a pending criminal proceeding against him would

22

in fact be adequate process to allow the City to suspend a driver's taxi license until the criminal charges are resolved. We expressly refrain from deciding that question today. We find the question at least open to debate among jurists of reason, however, and we note that the district court, in stating that such a hearing was adequate, relied on decisions that were out-of-circuit and at least arguably in some tension with *Krimstock*. In two of the cases, *Brown* and *Cooke*, the individuals were employees of the public agencies that suspended them, and those employees were charged with misconduct directly related to their jobs of public trust. *See Brown*, 715 F.2d at 664 (Border Patrol agents suspended after indictment for conspiracy to defraud the United States and willfully violating the civil rights of suspected illegal aliens); *Cooke*, 125 Fed. Appx. at 275 (Claims Representative for Social Security Administration suspended after United States Attorney filed criminal complaint accusing him of violations of Computer Fraud and Abuse Act by accessing confidential citizen records at work). There are at least three crucial distinctions here. First, taxi drivers are not City employees — they are private earners who hold a public license. *See Hecht v. Monaghan*, 307 N.Y. 461, 468-69 (1954) ("[A cab driver] is not the employee of any public body nor is he the appointee of any municipal officer. Rather, he is a private citizen whose livelihood is derived from the fares and gratuities he receives from the persons whom he serves as a licensed hack[8] driver. He is not under the direct supervision of a public official in the performance of his daily routine, but is merely regulated with regard to certain aspects of his business. The rules applicable to the disciplining, suspension and discharge of civil employees should not be extended to include the suspension or revocation of licenses of those whose salaries

---

[8] "Hack" is slang for taxi, and a taxi driver license may also be referred to as a "hack license." *See* Melissa Plaut, *Hack: How I Stopped Worrying About What to Do with My Life and Started Driving a Yellow Cab* (Villard ed. 2008).

23

are not paid from public funds."). Second, the misconduct that results in summary suspension need not be — and indeed the TLC is entirely agnostic on this point — related to the cab driver's work. And third, the TLC's summary suspension policy is triggered even by a warrantless arrest, whereas in *Brown* and *Cooke* there had been an independent probable cause determination.[9] In the third case, *Merritt*, a military contractor was suspended from eligibility for government contracts after it had been indicted for attempting to defraud the United States Navy. *See* 791 F.2d at 329. Although the contractor was not an employee, it nevertheless derived its income directly from the government, and, as in *Brown* and *Cooke*, prior to the contractor being suspended there had been (1) an independent determination of probable cause (2) for job-related crimes.

Balancing the *Mathews* factors in the post-deprivation context against the relative value of additional process, *see* 424 U.S. at 335, could lead to the conclusion that the plaintiffs' interests outweigh the burden on the City of providing additional procedural protections beyond mere confirmation of identity and charge. *See, e.g., Krimstock*, 306 F.3d at 67 ("Balancing the *Mathews* factors, we find that the Fourteenth Amendment guarantee that deprivations of property be accomplished only with due process of law requires that plaintiffs be afforded a prompt post-seizure, pre-judgment hearing before a neutral judicial or administrative officer to determine whether the City is likely to succeed on the merits of the forfeiture action . . . ."). In determining that additional procedures would be too burdensome on the City, the district court appears to have assumed that the only alternative to a hearing on identity and charge would be a hearing at which

---

[9] The district court stated that "*Cooke* is particularly relevant precedent in light of the fact that the suspension in that case followed only a criminal complaint, and not the issuance of an indictment." But the criminal complaint in *Cooke* was filed by the United States Attorney and would have resulted in the issuance of an arrest warrant or summons only after an independent determination of probable cause by a magistrate judge. *See* Fed. R. Crim. P. 3, 4.

24

the TLC would be required to prove that each driver engaged in the charged conduct.  It is entirely possible that a meaningful hearing can be devised at minimal cost to the City that does not constitute a mini-trial on the criminal charges.  Indeed, even a hearing at which the ALJ is permitted to examine the factual *allegations* underlying the arrest, without making a determination of likely guilt or innocence, would provide to drivers considerably more opportunity to be heard than the current system, as the ALJ might in some cases determine that the allegations, although arguably consistent with the criminal statute, do not provide any basis for finding the driver to be a threat to public safety.  And since the latter sounds very much like the hearing that the City has told us it already offers, we think that the logical next step is for the district court to determine what really occurs at the hearing and what the City means by what it says.

On remand, it will be necessary for the district court to conduct additional fact-finding, in the manner it deems appropriate, to determine whether the post-suspension hearing the City affords does indeed provide an opportunity for a taxi driver to assert that, even if the criminal charges are true, continued licensure does not pose any safety concerns.  The district court must then determine whether the hearing the City actually provides — whatever it may consist of — comports with due process.

IV.     State-law claims

Because we are vacating the grant of summary judgment with respect to one of the plaintiffs' federal claims, we also vacate the district court's dismissal of their state-law claims. Once the district court has determined how it will treat the federal claim, it may then examine how it will treat the state claims.  We express no view with respect to those claims or their disposition.

25

**CONCLUSION**

We affirm the judgment of the district court to the extent that it granted summary judgment in favor of the defendants with respect to the plaintiffs' claim that arrested drivers are entitled to pre-deprivation hearings.  We otherwise vacate the judgment of the district court and remand for further proceedings not inconsistent with this opinion.

Appendix to the opinion of the Court

# THE NEW YORK CITY TAXI AND LIMOUSINE COMMISSION
## SUMMARY SUSPENSION CRIME CHART – As of November 2, 2006

| | |
|---|---|
| PL 120.00 | Assault in the 3rd Degree – Class A Misdemeanor |
| PL 120.20 | Reckless Endangerment in the 2nd Degree – Class A Misdemeanor |
| PL 130.20 | Sexual Misconduct – Class A Misdemeanor |
| PL 130.55 | Sexual Abuse in the 3rd Degree – Class B Misdemeanor |
| PL 130.60 | Sexual Abuse in the 2nd Degree – Class A Misdemeanor |
| PL 245.00 | Public Lewdness – Class B Misdemeanor |
| PL 260.10 | Endangering the Welfare of a Child – Class A Misdemeanor |
| PL 265.01 | Criminal Possession of a Weapon (4th) – Class A Misdemeanor |
| | All Felonies |
| VTL 1192.1 | Driving While Ability Impaired - Infraction |
| VTL 1192.2 | Operation of a Motor Vehicle While Intoxicated - Class U Misdemeanor |
| VTL 1192.3 | Operation of a Motor Vehicle With an Illegal Blood-Alcohol Content - Class U Misdemeanor |
| VTL 1192.4 | Driving While Ability Impaired by Drugs - Class U Misdemeanor |
| VTL 600.2 | Leaving the Scene of an Accident – Class A or B  Misdemeanor or Class "E" felony |

| 100.05 | Criminal Solicitation in the 4th Degree – Class A Misdemeanor |
|---|---|
| 105.05 | Conspiracy in the 5th Degree – Class A Misdemeanor |
| 115.00 | Criminal Facilitation in the 4th Degree – Class A Misdemeanor |
| 120.14 | Menacing in the 2nd Degree – Class A Misdemeanor |
| 120.15 | Menacing in the 3rd Degree – Class B Misdemeanor |
| 135.05 | Unlawful Imprisonment in the 2nd Degree – Class A Misdemeanor |
| 135.45 | Custodial Interference in the 2nd Degree – Class A Misdemeanor |
| 135.60 | Coercion in the 2nd Degree – Class A Misdemeanor |
| 140.10 | Criminal Trespass in the 3rd Degree – Class B Misdemeanor |
| 140.15 | Criminal Trespass in the 2nd Degree – Class A Misdemeanor |
| 140.35 | Possession of Burglar's Tools – Class A Misdemeanor |
| 140.40 | Unlawful Possession of Radio Devices – Class B Misdemeanor |
| 145.00 | Criminal Mischief in the 4th Degree – Class A Misdemeanor |
| 145.14 | Criminal Tampering in the 3rd Degree – Class B Misdemeanor |
| 145.15 | Criminal Tampering in the 2nd Degree – Class A Misdemeanor |
| 145.25 | Reckless Endangerment of Property – Class B Misdemeanor |
| 155.25 | Petit Larceny – Class A Misdemeanor |
| 158.05 | Welfare Fraud in the 5th Degree – Class A Misdemeanor |
| 158.30 | Criminal Use of a Public Benefit Card (2nd) – Class A Misdemeanor |
| 165.00 | Misapplication of Property – Class A Misdemeanor |
| 165.05 | Unauthorized Use of a Vehicle in the 3rd Degree – Class A Misdemeanor |
| 165.09 | Auto Stripping in the 3rd Degree – Class A Misdemeanor |
| 165.15 | Theft of Services – Class Varies |
| 165.17 | Unlawful Use of a Credit/Debit/Public Benefit Card – Class A Misdemeanor |
| 165.20 | Fraudulently Obtaining a Signature – Class A Misdemeanor |
| 165.30 | Fraudulent Accosting – Class A Misdemeanor |
| 165.40 | Criminal Possession of Stolen Property (5th) – Class A Misdemeanor |
| 170.05 | Forgery in the 3rd Degree – Class A Misdemeanor |
| 170.20 | Criminal Possession of a Forged Instrument (3rd) – Class A Misdemeanor |
| 175.05 | Falsifying Business Records in the 2nd Degree – Class A Misdemeanor |
| 175.20 | Tampering With Public Records in the 2nd Degree – Class A Misdemeanor |
| 175.30 | Offering a False Instrument for Filing (2nd) – Class A Misdemeanor |
| 175.45 | Issuing a False Financial Statement – Class A Misdemeanor |
| 176.10 | Insurance Fraud in the 5th Degree – Class A Misdemeanor |
| 185.00 | Fraud in Insolvency – Class A Misdemeanor |
| 185.05 | Fraud Involving a Security Interest – Class A Misdemeanor |
| 185.10 | Fraudulent Disposition of Mortgaged Property – Class A Misdemeanor |
| 185.15 | Fraudulent Disposition of Property – Class A Misdemeanor |
| 190.20 | False Advertising – Class A Misdemeanor |
| 190.23 | False Personation – Class B Misdemeanor |
| 190.25 | Criminal Impersonation in the 2nd Degree – Class A Misdemeanor |
| 190.60 | Scheme to Defraud in the 2nd Degree – Class A Misdemeanor |
| 195.05 | Obstructing Governmental Administration (2nd) – Class A Misdemeanor |
| 195.10 | Refusing to Aid a Police/Peace Officer – Class B Misdemeanor |

1

| | |
|---|---|
| 200.30 | Giving Unlawful Gratuities – Class A Misdemeanor |
| 210.05 | Perjury in the 3rd Degree – Class A Misdemeanor |
| 210.35 | Making an Apparently Sworn False Statement (2nd) – Class A Misdemeanor |
| 210.45 | Making a Punishable False Written Statement – Class A Misdemeanor |
| 215.10 | Tampering With a Witness (4th) – Class A Misdemeanor |
| 215.23 | Tampering With a Juror (2nd) – Class B Misdemeanor |
| 215.25 | Tampering With a Juror (1st) – Class A Misdemeanor |
| 215.45 | Compounding a Crime – Class A Misdemeanor |
| 215.50 | Criminal Contempt in the 2nd Degree – Class A Misdemeanor |
| 220.03 | Criminal Possession of a Controlled Substance (7th) – Class A Misdemeanor |
| 220.50 | Criminally Using Drug Paraphernalia (2nd) – Class A Misdemeanor |
| 221.10 | Criminal Possession of Marijuana (5th) – Class B Misdemeanor |
| 221.15 | Criminal Possession of Marijuana (4th) – Class A Misdemeanor |
| 221.35 | Criminal Sale of Marijuana (5th) – Class B Misdemeanor |
| 221.40 | Criminal Sale of Marijuana (4th) – Class A Misdemeanor |
| 240.05 | Riot in the 2nd Degree – Class A Misdemeanor |
| 240.08 | Inciting to Riot – Class A Misdemeanor |
| 240.10 | Unlawful Assembly – Class B Misdemeanor |
| 240.25 | Harassment in the 1st Degree – Class B Misdemeanor |
| 240.30 | Aggravated Harassment in the 2nd Degree – Class A Misdemeanor |
| 245.11 | Public Display of Offensive Sexual Material – Class A Misdemeanor |
| 470.05 | Money Laundering in the 3rd Degree – Class A Misdemeanor |