19-1002-cv
Moya v. United States Department of Homeland Security

# United States Court of Appeals
# for the Second Circuit

August Term, 2019

(Argued: December 6, 2019          Decided: September 15, 2020)

Docket No. 19-1002-cv

_____

DAYSI MOYA, OBDULIA RUIZ, YOUTH MINISTRIES FOR PEACE AND JUSTICE, INC.,

*Plaintiffs-Appellants*,

SOYA FRANCES DE DANDRADE, MARIA VASQUEZ, MARISOL OJEDA DE NUNEZ, JUANA JIMENEZ, EDUVIGIS A. DEL ROSARIO, CHOU HANG, MIGUELINA DE LA CRUZ, PROJECT CITIZENSHIP, INC.,

*Plaintiffs*,

v.

UNITED STATES DEPARTMENT OF HOMELAND SECURITY, UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES, CHAD WOLF, AS ACTING SECRETARY OF THE UNITED STATES DEPARTMENT OF HOMELAND SECURITY, KENNETH T. CUCCINELLI, AS ACTING DIRECTOR OF THE UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES,

*Defendants-Appellees.*[*]

_____

Before:

JACOBS, CARNEY, and PARK, *Circuit Judges*.

---

[*] Under Fed. R. App. P. 43(c)(2), Chad Wolf is automatically substituted for Kevin McAleenan in his official capacity as Acting Secretary of the Department of Homeland Security. The Clerk is respectfully directed to amend the caption of this matter accordingly.

Daysi Moya, Obdulia Ruiz, and Youth Ministries for Peace and Justice, Inc. ("YMPJ") appeal an order of the United States District Court for the Southern District of New York (Castel, *J.*) dismissing their claims against the United States Department of Homeland Security, the United States Citizenship and Immigration Services, and their respective agency heads under the Immigration and Nationality Act ("INA"), the Administrative Procedure Act, the Rehabilitation Act, and the Fifth Amendment Due Process Clause. The district court held that: (1) Moya and Ruiz failed to exhaust their administrative remedies, (2) the Rehabilitation Act does not provide a cause of action against executive agencies acting as regulators, and (3) although YMPJ had Article III standing to bring suit, (4) YMPJ did not fall within the zone of interests of the INA or the Due Process Clause. Plaintiffs appeal from the district court's holdings on exhaustion, the Rehabilitation Act, and zone of interests, and Defendants challenge the district court's determination on Article III standing. We find that the district court correctly decided each of these issues and **AFFIRM**.

Judge Jacobs concurs in part and concurs in the judgment in a separate opinion.

Judge Carney concurs in part and dissents in part in a separate opinion.

CHRISTOPHER LAMB, Bronx Legal Services, Bronx, NY *for Plaintiffs-Appellants*.

ANTHONY J. SUN (Christopher Connolly, *on the brief*), *for* Geoffrey S. Berman, United States Attorney for the Southern District of New York, New York, NY.

PARK, *Circuit Judge*:

Plaintiffs Daysi Moya and Obdulia Ruiz applied to become naturalized citizens of the United States. The government denied their requests for disability exemptions from the civics and English testing requirements, and Moya and Ruiz

sued in federal court claiming that the naturalization process is unlawful. The Immigration and Nationality Act ("INA"), however, does not allow Moya and Ruiz to seek judicial review of the denial of their applications until "after completion of the available administrative review procedures." *Escaler v. U.S. Citizenship & Immigration Servs.*, 582 F.3d 288, 291 (2d Cir. 2009) (citing 8 U.S.C. § 1421(c)). Because Moya and Ruiz did not exhaust their administrative remedies, the district court properly dismissed their claims. The other plaintiff in this appeal is Youth Ministries for Peace and Justice, Inc. ("YMPJ"), a non-profit organization that assists applicants for naturalization. The district court correctly found that although YMPJ had Article III standing to sue, it did not fall within the zone of interests of the INA, the Administrative Procedure Act ("APA"), or the Due Process Clause and thus could not bring a cause of action on its own behalf. For these reasons, we affirm.

## I. BACKGROUND

**A.    Naturalization Process**

Under the INA, a lawful permanent resident ("LPR") who wishes to become a naturalized citizen must pass English and civics tests. 8 U.S.C. § 1423(a). The INA grants an exemption to "any person who is unable because of physical or

3

developmental disability or mental impairment" to comply with these testing requirements. *Id*. § 1423(b)(1). An applicant seeking this exemption "must submit Form N-648, Medical Certification for Disability Exceptions" (the "N-648 waiver"), to be completed by a licensed doctor or psychologist. 8 C.F.R. § 312.2(b)(2). If the applicant's N-648 waiver request is denied, she has two chances to pass the English and civics tests, and if she cannot do so, her naturalization application is denied. *Id*. §§ 312.2(c), 312.5(a), 336.1.

When "an application for naturalization is denied, the applicant may request a hearing before [a different] immigration officer." 8 U.S.C. § 1447(a). If that immigration officer affirms the denial, the applicant "may seek review of such denial before the United States district court for the district in which such person resides." *Id*. § 1421(c). The district court "shall make its own findings of fact and conclusions of law and shall, at the request of the petitioner, conduct a hearing de novo on the application." *Id*. Section 1421(c) provides the "[s]ole procedure" for applicants to challenge the denial of a naturalization application, and applicants must raise any such challenges "in the manner and under the conditions prescribed [by the INA] and not otherwise." *Id*. § 1421(d).

4

**B.**     **The Parties**

Plaintiffs Daysi Moya and Obdulia Ruiz (the "Individual Plaintiffs") are LPRs who applied to become naturalized citizens. They suffer from "major depressive disorder" and submitted N-648 waiver forms, but were denied exemptions from the testing requirements. Their naturalization applications were denied or withdrawn after they failed to satisfy the English and civics requirements twice.

Moya alleges that the immigration officer who considered her waiver request "did not review [her] N-648 disability waiver forms" prior to meeting with her, failed to "provide [her] with a detailed explanation or meaningful guidance," and otherwise failed to consider her application properly. Ruiz similarly claims that her N-648 waiver and naturalization application were rejected for arbitrary and improper reasons. Moya and Ruiz do not dispute that they failed to satisfy the INA's exhaustion requirement by seeking a hearing before a new immigration officer after their naturalization applications were denied. *See* 8 U.S.C. § 1421(c).

YMPJ is a non-profit organization that provides assistance to communities in the South Bronx, including "immigration services, specifically helping their eligible constituents become United States Citizens." YMPJ employs a United

States Department of Justice ("DOJ") "accredited representative" to help immigrants apply for citizenship. Between 2015 and 2017, when this lawsuit was filed, YMPJ's representative assisted with 118 naturalization applications. Eleven of these applications requested N-648 waivers, ten of which were denied after the first interview with an immigration officer.

Plaintiffs allege that "YMPJ's DOJ accredited representative expends additional resources in serving clients who require N-648 waivers . . . and, at minimum, spends twice as much time servicing naturalization clients who require N-648 waiver requests [as] those who do not." They further allege that rejection of an N-648 waiver imposes burdens on the DOJ-accredited representative, who must "work with physicians to supplement and revise N-648 disability waiver forms." Because Defendants' allegedly "unlawful policies and practices" lead to the rejection of more N-648 waivers, Plaintiffs claim that these policies force the representative to spend more time with disabled clients and less time with everyone else. As a result, YMPJ had to "divert substantial resources away from [its] primary mission in order to address, respond to, and alleviate the unlawful disability discrimination their clients face at the hands of the Defendants." This prevented YMPJ "from conducting [its] primary mission of assisting eligible

individuals to naturalize, requiring [YMPJ] to spend substantial time and resources overcoming unlawful discriminatory barriers to the naturalization of their clients."

Defendants-Appellees are the United States Department of Homeland Security, the United States Citizenship and Immigration Services, and the directors of those agencies (collectively, "Defendants" or the "government"). Plaintiffs allege that Defendants "routinely violate their own policies with regard to" N-648 waivers. They claim that Defendants subject disabled naturalization applicants seeking N-648 waivers "to arbitrary decision-making, discriminate against them on the basis of their disabilities," and otherwise "fail to provide them with reasonable accommodations" as required by law.

**C.    Procedural History**

In 2017 a group of LPRs and immigration-related non-profit organizations (including Moya, Ruiz, and YMPJ) sued Defendants for failing "to implement a fair and effective system for approving [N-648] waivers in violation of [their] obligations under the" INA, the APA, the Rehabilitation Act, and the Fifth

Amendment Due Process Clause.[1] Plaintiffs sought declaratory and injunctive relief to change the N-648 waiver process in various ways.

Defendants moved to dismiss the complaint for lack of subject-matter jurisdiction and failure to state a claim under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). The district court granted the motion in full and dismissed all of Moya's, Ruiz's, and YMPJ's claims.

First, the court held that the Individual Plaintiffs could not bring their INA, APA, or Due Process Clause claims in federal court because they had not exhausted their administrative remedies as required by 8 U.S.C. § 1421(c). Second, the court held that Plaintiffs could not sue under the Rehabilitation Act because the statute does not imply a private right of action against executive agencies in their regulatory capacity. Third, the court held that YMPJ had Article III standing to sue Defendants for their N-648 waiver practices because YMPJ alleged that Defendants' conduct impaired its mission of assisting immigrants. Fourth, the district court held that YMPJ could not bring suit under the INA, the APA, or the

---

[1] Originally, this suit included seven other individual plaintiffs and one other organizational plaintiff. The district court found that these individuals' claims were moot because Defendants approved their N-648 waivers, and the other organizational plaintiff did not join this appeal.

Due Process Clause because, unlike individual applicants for naturalization, the organization was not within the zone of interests of these laws.

Plaintiffs now appeal the district court's dismissal of their claims.

## II. DISCUSSION

When reviewing the dismissal of a complaint for lack of subject-matter jurisdiction or failure to state a claim, "we review factual findings for clear error and legal conclusions *de novo*, accepting all material facts alleged in the complaint as true and drawing all reasonable inferences in the plaintiff's favor." *Liranzo v. United States*, 690 F.3d 78, 84 (2d Cir. 2012); *Faulkner v. Beer*, 463 F.3d 130, 133 (2d Cir. 2006).

**A.    Exhaustion of Administrative Remedies**

The district court properly dismissed the Individual Plaintiffs' claims under the INA, the APA, and the Due Process Clause because they failed to exhaust their administrative remedies. The INA provides that "[a] person whose application for naturalization under this subchapter is denied, *after a hearing before [a second] immigration officer under section 1447(a) of this title*, may seek review of such denial before the United States district court . . . ." 8 U.S.C. § 1421(c) (emphasis added); *see also id*. § 1447(a) (request for hearing before immigration officer). The

9

Individual Plaintiffs failed to satisfy this statutory requirement, so they could not pursue their claims under the INA in district court.

It is true, as Plaintiffs argue, that Moya and Ruiz seek to challenge the N-648 wavier process generally and not merely the denials of their own naturalization applications. But this does not exempt them from the INA's exhaustion requirement. *See Bastek v. Fed. Crop Ins. Corp.*, 145 F.3d 90, 94 (2d Cir. 1998) ("Statutory exhaustion requirements are mandatory, and courts are not free to dispense with them.").

The Supreme Court's decision in *McNary v. Haitian Refugee Center*, 498 U.S. 479 (1991), is not to the contrary. There, the Supreme Court held that an administrative exhaustion requirement for Special Agricultural Workers ("SAWs") did not bar "general collateral challenges to unconstitutional practices and policies." *Id*. at 492. The Court reasoned that under "the limited judicial review procedures" available to SAWs, "meaningful judicial review of their statutory and constitutional claims would be foreclosed." *Id*. at 484; *see also id*. at 486 ("[T]he statute plainly foreclosed any review in the district courts of individual denials of SAW status applications. Moreover, absent initiation of a deportation

proceeding against an unsuccessful applicant, judicial review of such individual determinations was completely foreclosed.").

*McNary* is not applicable here because Section 1421(c) offers an expansive form of judicial review through which Plaintiffs could raise systemic challenges, including the ones they seek to bring in this lawsuit. Indeed, we have noted that Section 1421(c)'s "grant of authority is unusual in its scope—rarely does a district court review an agency decision de novo and make its own findings of fact." *Chan v. Gantner*, 464 F.3d 289, 291 (2d Cir. 2006) (citation omitted). If an applicant wishes to raise systemic constitutional or statutory challenges to the naturalization process as part of her appeal, the district court has the "factfinding and record-developing capabilities" to create "an adequate record as to the pattern" of systemic violations. *See McNary*, 498 U.S. at 497; *see also Elgin v. Dep't of Treasury*, 567 U.S. 1, 19 (2012) (holding that plaintiffs could not circumvent an administrative review scheme that "fully accommodates [their] potential need to establish facts relevant to [their] constitutional challenge"); *Aparicio v. Blakeway*, 302 F.3d 437, 447 (5th Cir. 2002) (holding that *McNary* does not allow plaintiffs to circumvent Section 1421(c)).

11

Nor are the Individual Plaintiffs' APA and constitutional claims exempt from the INA's exhaustion requirement. Although there is a "strong presumption that Congress intends judicial review of administrative action," *Sharkey v. Quarantillo*, 541 F.3d 75, 84 (2d Cir. 2008) (citation omitted), APA suits are subject to "statutes preclud[ing] judicial review," including exhaustion requirements, 5 U.S.C. § 701(a)(1). S*ee Darby v. Cisneros*, 509 U.S. 137, 153 (1993) (noting that the APA did not eliminate general "limitation[s] on judicial review," including "exhaustion doctrine[s]").[2] There is no general exception to statutory exhaustion requirements for constitutional claims, particularly when the statute at issue expressly provides for judicial review. *See, e.g., Theodoropoulos v. INS*, 358 F.3d 162, 172 (2d Cir. 2004) (applying an exhaustion requirement to a constitutional claim).

In short, Section 1421(c)'s exhaustion requirement is "mandatory," and the Individual Plaintiffs may not sue until they have satisfied it. *Bastek*, 145 F.3d at 94.

**B.    Implied Right of Action under the Rehabilitation Act**

The district court also correctly held that Plaintiffs cannot assert a claim against the government under the Rehabilitation Act. The Rehabilitation Act

---

[2] *Sharkey v. Quarantillo*, on which Plaintiffs rely, did not involve an exhaustion requirement, but rather a statute barring *any* judicial review of agency decisions, and we held that this complete bar did not apply to plaintiffs' APA claims. 541 F.3d at 90.

states that no "qualified individual with a disability . . . shall, solely by reason of her or his disability, be [discriminated against] . . . under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency." 29 U.S.C. § 794(a). The statute does not, however, create an express right of action allowing private parties to sue agencies for discriminatory regulations, as Plaintiffs wish to do here. *Id*. Nor does the statute reflect Congress's intent to imply a private right of action against executive agencies as regulators.

When analyzing whether a statute implies a private right of action, our "interpretive inquiry begins with the text and structure of the statute and ends once it has become clear that Congress did not provide a cause of action." *Alexander v. Sandoval*, 532 U.S. 275, 288 n.7 (2001) (citation omitted); *see also Lopez v. Jet Blue Airways*, 662 F.3d 593, 596 (2d Cir. 2011). "[I]mplied rights of action are disfavored, and will not be found in the absence of clear evidence of legislative intent." *Prousalis v. Moore*, 751 F.3d 272, 278 (4th Cir. 2014) (citation omitted); *see also Alexander*, 532 U.S. at 286 ("statutory intent . . . is determinative").

The text of the Rehabilitation Act does not evince a "clear manifestation of congressional intent" to create a private right of action against executive agencies

13

acting in their regulatory capacity. *Jet Blue Airways*, 662 F.3d at 596. Although the Rehabilitation Act prohibits discrimination by executive agencies acting as both grant providers and regulators, it authorizes an express private right of action to enforce only the grant-making provision. *See* 29 U.S.C. § 794a (providing a cause of action to "any person aggrieved by any act or failure to act by any recipient of Federal assistance or Federal provider of such assistance"). From this, we conclude that Congress did not imply a private right of action against agencies as regulators. *Brennan-Centrella v. Ritz-Craft Corp. of Penn.*, 942 F.3d 106, 111 (2d Cir. 2019) ("As a matter of statutory construction, we presume that the legislature follows the principle of *expressio unius est exclusio alterius*—that is, 'mention of one impliedly excludes others.'" (citation omitted)).

This conclusion is buttressed by the fact that Congress expressly provided two alternative mechanisms to enforce the prohibition against discriminatory agency action. *See Alexander*, 532 U.S. at 290 ("The express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others."); *accord Bellikoff v. Eaton Vance Corp.*, 481 F.3d 110, 116 (2d Cir. 2007). First, Section 794(a) directs agency heads to "promulgate such regulations as may be necessary to carry out the" prohibition against discrimination. Second,

14

the APA provides an express cause of action for plaintiffs who wish to sue an executive agency for violating the Rehabilitation Act, as the First and Fourth Circuits have noted. *See Cousins v. Sec'y of the U.S. Dep't of Transp.*, 880 F.2d 603, 605–06 (1st Cir. 1989) (en banc) (Breyer, *J.*) (holding that the Rehabilitation Act does not imply a private right of action against agencies as regulators because the APA already allows for such suits); *Clark v. Skinner*, 937 F.2d 123, 125–26 (4th Cir. 1991) (same). The availability of these alternative mechanisms to enforce the Rehabilitation Act strongly suggests that Congress did not intend to imply a superfluous private right of action.

**C.    Article III Standing**

Having found that the district court properly dismissed the Individual Plaintiffs' claims, we turn next to whether YMPJ can "independently satisfy" the requirements of Article III and bring suit by itself. *Nnebe v. Daus*, 644 F.3d 147, 156 (2d Cir. 2011). The district court correctly found that YMPJ alleged sufficient injury to demonstrate standing at the pleading stage.

Article III standing requires that a plaintiff "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v.*

15

*Robins*, 136 S. Ct. 1540, 1547 (2016). "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id*. at 1548 (citation omitted). The issue here is whether YMPJ adequately pled an injury in fact by alleging that Defendants' conduct caused it to spend "substantial time and resources" on N-648 waiver applications, which has "frustrated" its organizational mission of helping disabled naturalization applicants.[3]

"We have recognized that only a 'perceptible impairment' of an organization's activities is necessary for there to be an 'injury in fact.'" *Nnebe*, 644 F.3d at 157 (citation omitted). As with any injury in fact, however, that impairment must be "concrete and particularized." *Spokeo*, 136 S. Ct. at 1548. In *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay* ("*Centro*"), 868 F.3d 104 (2d Cir. 2017), we reiterated that "where an organization diverts its resources away from its current activities, it has suffered an injury that has been repeatedly held to be independently sufficient to confer organizational standing." *Id*. at 111 (citing

---

[3] YMPJ does not claim standing on behalf of its members or clients but is "su[ing] to vindicate its own rights as an organization with goals and projects of its own." *N.Y. Civil Liberties Union v. N.Y.C. Transit Auth.*, 684 F.3d 286, 295 (2d Cir. 2012).

16

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982)).  The plaintiff in *Centro*, an organization that worked with day laborers, alleged injury from a town ordinance that prevented laborers from congregating and soliciting work at certain locations because the plaintiff would "inevitably face increased difficulty in meeting with and organizing those laborers."  868 F.3d at 110.  We held that these allegations were adequate because the plaintiff had "to divert money from its other current activities to advance its established organizational interests" of finding and organizing day laborers.[4]  *Id.*

Here, YMPJ repeatedly alleges that Defendants' conduct has "frustrated" its "organizational mission . . . of assisting eligible individuals to naturalize" by requiring it "to spend substantial time and resources overcoming unlawful discriminatory barriers to the naturalization of [its] clients."  Specifically, YMPJ alleges a diversion of its resources because its sole DOJ-accredited representative must "work with physicians to supplement and revise N-648 disability waiver forms," and "attend[] the naturalization interviews for clients who require an N-648 disability waiver request."  This additional work requires the DOJ-accredited

---

[4] The *Centro* court also relied on the fact that the plaintiff "offered evidence that those responsible for enforcing the [new law] are likely to confuse the conduct of [plaintiff's] activists with that of the day laborers," creating "a risk of erroneous arrest."  *Id.* at 111.

17

representative "at a minimum, [to spend] twice as much time servicing" clients who require N-648 waiver requests, leaving less time for YMPJ's other clients. *See supra* at 6–7. These alleged obstacles "constitute far more than simply a setback to [YMPJ's] abstract social interests"—they represent a real "drain on the organization's resources." *Havens Realty Corp.*, 455 U.S. at 379; *see also New York v. U.S. Dep't of Homeland Sec.*, 969 F.3d 42, 61 (2d Cir. 2020) (finding standing based on nonprofit organizations' "diverted resources that would otherwise have been available for other programming"). We thus agree with the district court that YMPJ has alleged a "perceptible impairment" of its ability to help immigrants that is sufficiently "concrete and particularized" to survive a motion to dismiss. *Nnebe*, 644 F.3d at 157; *Spokeo*, 136 S. Ct. at 1548.[5]

Judge Jacobs would hold that YMPJ's alleged diversion of resources does not suffice for standing because "navigating the immigration laws is not a diversion from [YMPJ's] current activity; it is the current activity itself," and because YMPJ has been able to continue performing that activity, albeit with less

---

[5] Although these pleadings suffice for standing here, YMPJ would need to produce evidence of its injury if the litigation were to proceed. *See Lerman v. Bd. of Elections*, 232 F.3d 135, 142 (2d Cir. 2000) ("The determination of whether Article III standing exists [ ] must comport with the 'manner and degree of evidence required at the successive stages of the litigation.'" (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992))).

18

"efficiency and success." Concurrence at 2–3. But we have previously held that a plaintiff needs to allege only "some perceptible opportunity cost" from the "expenditure of resources that could be spent on other activities." *Nnebe*, 644 F.3d at 157; *accord Havens Realty Corp.*, 455 U.S. at 379 (finding injury in fact because of a "concrete and demonstrable injury to [an] organization's activities—with the consequent drain on the organization's resources"). As explained above, substantial expenditure of resources and frustration of an organization's mission are sufficient under our precedents to establish injury in fact. Judge Jacobs's quarrel thus appears to be with the cases we are bound to follow.

**D. Zone of Interests**

Even though YMPJ adequately pled Article III standing, the district court correctly dismissed its claims because they did not fall within the zone of interests of the APA, the INA, and the Due Process Clause. "Whether a plaintiff comes within the 'zone of interests' is an issue that requires us to determine, using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127 (2014) (cleaned up). The zone-of-interests test "was formerly called 'statutory standing,'" but the Supreme Court

19

has since clarified that it "in fact is not a standing issue, but simply a question of whether the particular plaintiff 'has a cause of action under the statute.'" *Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352, 359 (2d Cir. 2016) (quoting *Lexmark*, 572 U.S. at 128); *see also Fed. Defs. of N.Y., Inc. v. Fed. Bureau of Prisons*, 954 F.3d 118, 129 (2d Cir. 2020).

Although the Supreme Court "announced the modern zone-of-interests test in 1971, its roots lie in the common-law rule that a plaintiff may not recover under the law of negligence for injuries caused by violation of a statute unless the statute 'is interpreted as designed to protect the class of persons in which the plaintiff is included, against the risk of the type of harm which has in fact occurred as a result of its violation.'" *Lexmark*, 572 U.S. at 130 n.5 (quoting W. Keeton, D. Dobbs, R. Keeton, & D. Owen, *Prosser & Keeton on Law of Torts* § 36, pp. 229–230 (5th ed. 1984)).

We analyze the zone of interests for two causes of action—the APA claim based on the INA and the Due Process Clause claim.[6] *See Lexmark*, 572 U.S. at 130

---

[6] Other than the Rehabilitation Act claim, which is meritless for the reasons stated above, Plaintiffs articulate only two distinct legal causes of action: (1) an APA claim based on violations of the INA and (2) a Due Process claim. As to the former, although the complaint lists separate causes of action under the INA and the APA, the APA claim is based on Defendants' alleged substantive violations of the INA. *See infra* at 21–22.

("the breadth of the zone of interests varies according to the provisions of law at issue" (internal quotation marks omitted)).

### 1. INA-Based APA Claim

YMPJ does not fall within the class of persons specified in the INA's naturalization provisions as having the right to sue—namely, naturalization applicants. It nevertheless wishes to sue under the INA because "Defendants' unlawful policies and practices . . . [have] frustrate[d] [its] mission of helping eligible constituents become United States Citizens." But YMPJ must have more than a derivative interest in someone else's rights to satisfy the zone-of-interests test. It would be "inconsistent with the purposes implicit" in the INA's naturalization scheme to find that YMPJ can bring suit here, particularly because YMPJ would then be able to evade the statute's exhaustion requirements. *Lexmark*, 572 U.S. at 130 (citation omitted).

#### a. *The APA Zone-of-Interests Test*

"The relevant zone of interests for an APA claim is defined by 'the statute that the plaintiff says was violated,' rather than by the APA itself." *Fed. Defs.*, 954 F.3d at 128 (internal alterations omitted) (quoting *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012)). Here, YMPJ alleges that

Defendants violated 8 U.S.C. § 1423(b)(1), which states that the naturalization testing requirements "shall not apply to any person who is unable because of physical or developmental disability or mental impairment to comply therewith." While we must consider Section 1423(b)(1) in the "overall context" of the INA and its naturalization scheme, "the zone-of-interests test is to be determined not by reference to the overall purpose of the Act in question . . . but by reference to the particular provision of law upon which [YMPJ] relies." *Bennett v. Spear*, 520 U.S. 154, 175–76 (1997); *Clarke v. Secs. Indus. Ass'n*, 479 U.S. 388, 401 (1987).[7]

The zone-of-interests "test denies a right of review if [YMPJ's] interests are so marginally related to or inconsistent with the purposes implicit in [Section 1423(b)(1)] that it cannot reasonably be assumed that Congress intended to permit the suit." *Clarke*, 479 U.S. at 399. While this test is "lenient," *Lexmark*, 572 U.S. at 130, it is not toothless, as YMPJ "must show less than an intent to benefit

---

[7] It is appropriate to draw on the "overall context" of a statute only when doing so is helpful to understand the meaning of the specific provisions at issue. *See* Dissent at 6–7 (discussing the need to consider "overall context"). In *Clarke*, the Supreme Court stated that "we are not limited to considering the statute under which respondents sued, but may consider any provision that helps us to understand Congress' overall purposes in [enacting] the [predicate statute]." *Clarke*, 479 U.S. at 401. The Court later cautioned, however, that *Clarke* "must be taken in the context in which it was made." *Air Courier Conference of Am. v. Am. Postal Workers Union AFL-CIO*, 498 U.S. 517, 529 (1991). Specifically, *Clarke* interpreted the provision at issue by reference to another provision in the statute only because the former was "a limited exception to the otherwise applicable requirement of" the latter. *Id.* (quoting *Clarke*, 479 U.S. at 401).

22

but more than a marginal relationship to the statutory purposes." *Fed'n of Am. Immigration Reform, Inc. v. Reno*, 93 F.3d 897, 900 (D.C. Cir. 1996) (cleaned up); *see also Air Courier Conference of Am.*, 498 U.S. at 530 (rejecting an approach that "could deprive the zone-of-interests test of virtually all meaning").

### b.    *YMPJ's Derivative Interests*

YMPJ's interest in improving the naturalization process for the sake of its clients does not satisfy the zone-of-interests test.   Section 1423(b)(1) does not provide a cause of action to advocacy organizations like YMPJ.  Indeed, it would not even affect YMPJ but for its "mission of helping [ ] eligible constituents" comply with the statute and the resources it expends in pursuit of that mission. Thus, YMPJ's interest is entirely "derivative" of its clients' interests, and "this is precisely the sort of claim that the [zone-of-interests] doctrine is designed to foreclose." *Ctr. for Reprod. Law & Policy v. Bush ("CRLP")*, 304 F.3d 183, 196 (2d Cir. 2002) (Sotomayor, *J.*) (citation omitted); *see Haitian Refugee Ctr. v. Gracey*, 809 F.2d 794, 813 (D.C. Cir. 1987) ("If any person or organization interested in promoting knowledge, enjoyment, and protection of the rights created by a statute . . . has an

interest that falls within the zone protected or regulated by the statute[,] . . . then the zone-of-interest test is not a test because it excludes nothing.").[8]

"The core concern of the zone-of-interests doctrine is, after all, whether a plaintiff has a cause of action under the law invoked." *Fed. Defs.*, 954 F.3d at 129. This plainly requires more than an altruistic concern for somebody else's rights. For example, in *Patchak*, the Supreme Court held that the plaintiff landowner could challenge the acquisition of neighboring land under the Indian Reorganization Act, 25 U.S.C. § 5108, because the provision at issue was so "entwined with considerations of land use" that "neighbors to the use (like [the plaintiff]) are reasonable—indeed, predictable—challengers." 567 U.S. at 227. The plaintiff himself claimed "economic, environmental, and aesthetic harm as a nearby property owner," not just an indirect harm to someone else. *Id*. at 224. Similarly, in *Federal Defenders*, this Court held that defense attorneys satisfied the zone-of-interests test when they sued under regulations requiring attorney-inmate visits and thus "sheltering [the defense attorneys'] . . . interests in having frequent and

---

[8] The dissent suggests that we should not extend *CRLP*'s reasoning on derivative interests from the Due Process context to the APA analysis here. Dissent at 16 n.8. But nothing in *CRLP* cabins its reasoning in this way, and the court's concerns that the plaintiffs sought to make their claims "actionable merely by attaching them to a third party's . . . interests" are just as relevant in this context. 304 F.3d at 196.

24

predictable access to clients."  954 F.3d at 128.  We found that the attorneys sought "to protect their [own] interests in having adequate access to their clients"—they did not have to rely on a derivative interest in their clients' access to counsel.[9]  *Id*. at 131.

Unlike the plaintiffs in *Patchak* and *Federal Defenders*, YMPJ is a crucial step removed from the challenged statute.  The effect of Section 1423(b)(1)'s disability-waiver process on YMPJ is derived entirely from YMPJ's efforts to assist the disabled naturalization applicants who are directly regulated by the statute.[10]

_____

[9] The dissent asserts that this case is "materially indistinguishable" from *Federal Defenders* because the plaintiff organization in both cases "would not have been injured by the government's alleged misconduct *but for* its own efforts to fulfill its organizational mission by helping clients who were 'directly regulated' by the challenged law."  Dissent at 5 n.4, 16 (citation omitted).  But *Federal Defenders* did not endorse such a broad, "but for" zone-of-interests test.  Instead, it held that attorneys fell within the zone of interests of the challenged regulations because their own "interests mirror the interests that [the regulations at issue] . . . seek to protect."  954 F.3d at 131.  Here, YMPJ's interests are indirect and derivative of the interests of the naturalization applicants they assist.

[10] Our recent decision in *New York v. U.S. Department of Homeland Security*, which concerned the INA's public-charge provision, does not change this analysis.  969 F.3d at 62.  Here, Congress created a cause of action for naturalization applicants without creating a cause of action for advocacy organizations, whereas the public-charge statute did not explicitly create a cause of action for anybody.  *Id.*  The public-charge statute thus required a broader zone-of-interests inquiry to discern whether plaintiff organizations could assert an APA claim.  In addition, it was necessary in that case to "consider the role of the public charge ground within the broader context of the INA" because the public-charge statute acted as an exception to other immigration statutes, and thus can be understood only in the context of those other statutes.  *Id*. (noting that the public-charge statute acts as an exception to 8 U.S.C. § 1255, which permits adjustment of status for some immigrants).  Thus, as in *Clarke*, we had to apply the zone-of-interests test "not merely in light of [the public-charge statute], which was the basis of the plaintiffs' claim on the merits, but also in

25

Simply "assum[ing] that Congress intended to permit" suit from such an indirect beneficiary would render the zone-of-interests test essentially meaningless. *Patchak*, 567 U.S. at 225 (citation omitted); *see Haitian Refugee Ctr.*, 809 F.2d at 813 ("If . . . the zone of interests to be protected or regulated by every statute necessarily includes an organization's . . . interest in promoting the rights created by that statute, that . . . would render the entire concept of a zone of interest a nullity." (emphasis omitted)).[11]

Moreover, YMPJ's alleged diversion of resources, although sufficient for Article III standing, does not bring a third party within the INA's zone of interests. *See INS v. Legalization Assistance Project of L.A. Cty. Fed'n of Labor*, 510 U.S. 1301, 1305 (O'Connor, *J.*, in chambers) ("The fact that . . . [an immigration] regulation

---

the light of [other provisions of the INA], to which [the public-charge statute] was an exception." *Id.* (quoting *Air Courier Conference of Am.*, 498 U.S. at 529). That is not the case here, where the naturalization provision at issue, Section 1423, does not act as an exception to any other section that would suggest a broader zone of interests.

[11] The dissent contends that the practical consideration of having "a reliable private attorney general to litigate the issues of the public interest" favors YMPJ because "YMPJ is both well-positioned and highly incentivized to enforce" the INA's statutory provisions. Dissent at 7 (quoting *Clarke*, 479 U.S. at 397 n.12). But the issue of who might be a vigorous and well-resourced litigant is a policy concern that does not bear on the zone-of-interests analysis. In any event, the INA authorizes naturalization applicants themselves to sue, and may also permit organizations that employ applicants or have them as members to bring claims as well—a question we do not reach today. *See, e.g.*, *Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, 279 F. Supp. 3d 1011, 1036 (N.D. Cal. 2018) (plaintiffs fell within the zone of interests because of "injuries resulting from their status as employers"); *Battalla Vidal v. Nielsen*, 291 F. Supp. 3d 260, 269 n.3 (E.D.N.Y. 2018).

26

may affect the way an organization allocates its resources . . . does not" bring that organization "within the zone of interests the statute [was] meant to protect."). Whether a plaintiff is within the zone of interests protected by a statute is a different inquiry from whether she has Article III standing. *See Clarke*, 479 U.S. at 395 ("Congress, in enacting § 702 [of the APA], had not intended to allow suit by every person suffering injury in fact."); *In re Peeples*, 880 F.3d 1207, 1215 (10th Cir. 2018) ("The very point of the zone-of-interests doctrine is that not every injury traceable to the violation of a federal statute is remediable in the federal courts.").

### c. Other Indications of Congressional Intent

The fact that YMPJ expends resources in pursuit of its mission does not mean that Congress intended to protect its interests through the naturalization provisions of the INA. To the contrary, allowing YMPJ to bring suit would be "inconsistent" with Congress's purpose of streamlining the naturalization process. *Lexmark*, 572 U.S. at 130 (citation omitted). In 1990, Congress amended the INA to clarify the procedures under which a naturalization applicant can sue. *See* Immigration Act of 1990, § 401(a), 8 U.S.C. § 1421. The bill's sponsors sought to "streamline" the process, which until then had required all applicants to file their petitions in heavily backlogged district courts. *See* 135 Cong. Rec. H4543 (daily ed.

27

July 31, 1989) (statement of Rep. Smith). For example, to minimize the strain on judicial resources, Congress permitted applicants to petition the district court only "after the application has already been reviewed by the INS"; and even then, district courts retained "the option to remand the case back to" the INS for further fact-finding. *Id.* And although the bill initially allowed applicants to file petitions in the district court if the INS did not act on their application within 90 days, the drafters extended the deadline to 120 days to help ensure that the bill did "not take away any of the judicial review rights accorded applicants." *Id.*; 135 Cong. Rec. H4542 (daily ed. July 31, 1989) (statement of Rep. Morrison).

Because Section 1421 reflects Congress's efforts to balance the competing interests of efficiency and access to courts, it "cannot reasonably be assumed that Congress intended to permit" YMPJ to do derivatively what disabled naturalization applicants themselves cannot do directly—*i.e.*, to bring suit without first exhausting administrative remedies.[12] *Clarke*, 479 U.S. at 399.

---

[12] The dissent argues that we should not rely on the fact that Congress has already designated naturalization applicants as the proper plaintiffs to sue because this "implied preclusion" logic was "developed and exists separate from the zone-of-interests inquiry." Dissent at 22. But we apply the zone-of-interests test "using traditional tools of statutory interpretation." *Lexmark*, 572 U.S. at 127. And the commonsense "*expressio unius*" canon is one such tool. *See Brennan-Centrella*, 942 F.3d at 111; *supra* at 13–15; *accord Fed. Defs.*, 954 F.3d at 130 ("[C]anons [of statutory interpretation] can help courts apply the zone-of-interests doctrine, given that the related inquiry is, in most cases, simply an exercise in statutory interpretation.").

28

YMPJ relies on the Ninth Circuit's decision in *East Bay Sanctuary Covenant v. Trump*, which held that plaintiff advocacy organizations fell within the zone of interests of the INA's refugee and asylum provisions. 932 F.3d 742, 768 (9th Cir. 2018). But even if we found that decision persuasive, the INA provisions at issue there explicitly acknowledge the role of advocacy organizations in providing legal aid, which suggests that Congress may have intended to protect their interests as participants in the asylum-seeking process. *See* 8 U.S.C. § 1158(d)(4)(B) (directing the Attorney General to "provide [asylum seekers] a list of persons . . . who have indicated their availability to represent aliens in asylum proceedings on a pro bono basis"); *East Bay*, 932 F.3d at 768–69. In contrast, the naturalization provisions at issue here contain no such language. *See* 8 U.S.C. § 1421.

The Ninth Circuit in *East Bay* also pointed to other sections of the INA outside the asylum and refugee provisions that referenced advocacy organizations. *See, e.g.*, 932 F.3d at 769 (citing 8 U.S.C. §§ 1101(i)(1), 1184(p)(3)(A), 1228(a)(2), 1228(b)(4)(B)); *see also* Dissent at 6–8.[13] But the Supreme Court has

---

[13] Unlike these sections of the INA, which explicitly recognize a role for advocacy organizations in providing legal-aid services to immigrants, the naturalization provisions mention civic groups only as a conduit for disseminating information to the community. *Compare* 8 U.S.C. § 1101(i)(1) ("[The government], where appropriate, shall provide [T-visa applicants] with a referral to a nongovernmental organization that would advise [them] regarding [their]

explicitly warned against using the "overall purpose of the Act in question," particularly a broad and multifaceted act such as the INA, to identify the purpose of "the particular provision of law upon which [YMPJ] relies." *Bennett*, 520 U.S. at 175–76. "[T]o accept this level of generality in defining the 'relevant statute' could deprive the zone-of-interests test of virtually all meaning." *Air Courier Conference of Am.*, 498 U.S. at 529–30.

The dissent questions our reliance on "legal principles that are customarily treated as separate from the zone-of-interests inquiry." Dissent at 19. But as explained above, the Supreme Court has instructed that the zone-of-interests test requires "using traditional tools of statutory interpretation," which is just what we have done. *Lexmark*, 572 U.S. at 127. To the extent that "[c]ommon sense, reflected in the canon *expressio unius est exclusio alterius*" is found elsewhere in our caselaw, that is a feature, not a bug, of doctrinal development. *Arizona v. United States*, 567 U.S. 387, 432 (2012) (Scalia, *J.*, concurring in part). Ironically, it is the dissent that

options while in the United States and the resources available to [them] . . . ."); *id.* § 1184(p)(3)(A) (similar for U-visa applicants), *with id.* § 1443(h) ("[T]he Attorney General shall broadly distribute information concerning the benefits which persons may receive under [the naturalization] subchapter and the requirements to obtain such benefits . . . [and] shall seek the assistance of appropriate community groups, private voluntary agencies, and other relevant organizations."). Congress could have articulated a legal-aid role for advocacy organizations in the naturalization subchapter as it did in other parts of the INA. The fact that it did not do so cautions against inferring from Section 1443(h) that YMPJ has an interest that is greater than what Congress stated. *See* Dissent at 6–7.

imports incompatible Article III standing caselaw into its zone-of-interests analysis, even though these are "separate and distinct" inquiries. *Citizens for Responsibility & Ethics in Washington v. Trump*, 953 F.3d 178, 200 (2d Cir. 2019) (citing *Lexmark*, 572 U.S. at 125–28); Dissent at 13–14 (citing, among other cases, *Centro*, 868 F.3d at 110–11; *Nnebe*, 644 F.3d at 157).

In short, we hold that YMPJ does not fall within the zone of interests of Section 1423(b)(1), which provides a cause of action to naturalization applicants, not to advocacy organizations. If an organization could satisfy the zone-of-interests test simply by asserting a derivative interest in helping naturalization applicants to vindicate their rights under a statute—particularly when the statute specifically designates those applicants as the proper plaintiffs to bring suit—the test would be meaningless because it "excludes nothing." *Haitian Refugee Ctr.*, 809 F.2d at 813. The zone-of-interests test retains more vitality than that, even in the APA context.

### 2. Due Process Claim

Nor do YMPJ's claims fall within the Due Process Clause's zone of interests. The district court correctly found that this issue is governed by *Center for Reproductive Law and Policy v. Bush*, 304 F.3d 183 (2d Cir. 2002). There, American

individuals and an American "nonprofit advocacy organization devoted to the promotion of reproductive rights" sued the government over restrictions on aid to foreign organizations related to abortion. *Id.* at 187. Plaintiffs brought a Due Process claim against the government for failing to give clear notice to foreign nonprofits on what this restriction covered. *Id.* at 188. We held that plaintiffs' claims were not within the zone of interests of the Due Process Clause because the only "due process-type harm" the American plaintiffs suffered was "derivative" of the harm suffered by third-party, foreign nonprofits. *Id.* at 196. Because "plaintiffs do not assert a harm to their own interest in receiving due process of law, this is precisely the sort of claim that the [zone of interests] doctrine is designed to foreclose." *Id.*

YMPJ is in the same position as the plaintiffs in *CRLP* because it alleges only indirect, derivative harm. YMPJ seeks to piggyback on the due process claims of naturalization applicants like Moya and Ruiz; it does not claim that YMPJ itself has been denied due process. Any harm YMPJ suffered is therefore derivative of the harm suffered by its clients, and under *CRLP*, such harm does not fall within the zone of interests of the Due Process Clause.

32

## III. CONCLUSION

For the reasons set forth above, the district court's judgment is affirmed.

DENNIS JACOBS, *Circuit Judge*, concurring in part and concurring in the judgment:

I join the Court's opinion insofar as it dismisses the claims of Daysi Moya and Obdulia Ruiz, and insofar as it holds that Youth Ministries for Peace and Justice ("Peace and Justice") is outside the zone of interests of the Immigration and Nationality Act and the Due Process Clause. I respectfully disagree with the holding that Peace and Justice has Article III standing. While the ruling on Article III standing is in my view an error, it nevertheless commands two votes; so I reach the zone-of-interests analysis, agree with it, and join the mandate.

Peace and Justice assists lawful permanent residents ("LPRs") in applying for citizenship, among them LPRs with disabilities who seek an exemption from the English and civics testing requirements, pursuant to 8 U.S.C. § 1423(b)(1). According to Peace and Justice, certain features of the naturalization law and regulations make that process more difficult than it should be, and reduce the chances of success. And it asserts Article III standing to challenge those features on the ground that Peace and Justice must spend more time and resources guiding disabled applicants through the process, and cannot assist as many individuals as it otherwise would.

As the majority opinion recites, Article III standing requires that the plaintiff "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). "[W]here an organization diverts its resources away from its current activities, it has suffered an injury that has been repeatedly held to be independently sufficient to confer organizational standing." *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 109 (2d Cir. 2017) (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)).

The "current activities" of Peace and Justice are to prepare applications, render advice, and shepherd applicants through the naturalization process. Critically, there is no allegation that it has been diverted from these activities. Rather, the claim is that the government's policies and practices make it harder for Peace and Justice to secure citizenship for persons who seek exemption from the usual requirements--or that, at any rate, the chance of success is reduced. That is not enough. For Peace and Justice, navigating the immigration laws is not a diversion from its current activity; it is the current activity itself. It is error to conflate (a) failure to maximize efficiency and success in the group's mission

2

with (b) a diversion of resources from that mission. That is a fallacy that nearly reduces Article III standing to nothing. To illustrate:

Boy Scouts assist the aged and infirm to cross the street. If at a local highway crossing, the green light were prolonged and the red more brief, a scout could get more disabled pedestrians across. Under the majority opinion, the Boy Scouts would have Article III standing to influence the traffic signals. By the same token, truckers would have Article III standing to seek a shorter interval for pedestrian crossing.

The majority opinion thus renders Article III standing negligible. To get there, the majority relies on *Centro*. As little as *Centro* required for Article III standing, the majority requires even less. To prevent job-seeking day laborers from congregating in a highly trafficked area, the New York Town of Oyster Bay passed an ordinance prohibiting people from soliciting employment from passing cars and trucks. *Centro*, 868 F.3d at 107. An immigrant-support organization challenging the ordinance was held to have Article III standing because its "activities include[d] traveling to day laborer sites in Oyster Bay to speak with laborers and if the Ordinance achieve[d] one of its principal objectives--dispersement of day laborers--[the organization] w[ould] inevitably

3

face increased difficulty in meeting with and organizing those laborers." *Id.* at 110. Accordingly, the organization would need to "divert money from its other current activities to advance its established organizational interests (*i.e.*, if the laborers are dispersed, it will be more costly to reach them)." *Id.*

In support, *Centro* relied on *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), which held that an organization that provides counseling services to home-seekers of limited means had standing to challenge an apartment complex's racial steering practices. The Court reasoned that the "steering practices have perceptibly impaired [the organization's] ability to provide counseling and referral services for low- and moderate-income homeseekers," and the Court therefore credited the claim that the organization "had to devote significant resources to identify and counteract the defendant's racially discriminatory steering practices." *Id.* at 379 (internal quotation marks omitted).

In both *Havens* and *Centro*, the plaintiff-organizations had Article III standing only because they "divert[ed] . . . resources away from [their] *current* activities," which was their work with individual clients. *Centro*, 868 F.3d at 111 (emphasis added) (citing *Havens*, 455 U.S. at 379); *accord New York v. U.S. Dep't of Homeland Sec.*, 969 F.3d 42, 61 (2d Cir. 2020) (holding that organizations had

4

Article III standing because DHS's new public-charge rule "required significant diversion of resources" from the organizations' ordinary programming and social services). In *Havens*, that meant investigating and rooting out discrimination in addition to providing counseling and referral services. In *Centro*, that meant locating the day laborers instead of meeting with and organizing them. Here, however, Peace and Justice simply desires to work more efficiently and successfully in providing the *exact same services* for more clients.

Every organization wishes to function more efficiently and achieve more success, just as the Boy Scout wishes to help even more people across the street and the trucker wishes to speed deliveries.[1] But we have never held that Article III standing is satisfied whenever a law or regulation could be rewritten to make it easier for an organization to perform its activities.

*Centro* needs clarification; the holding in this case needs intervention.

\* \* \*

---

[1] Under the majority's analysis, even an individual Boy Scout would have Article III standing to regulate the traffic signals. In *Centro*, this Court declined to decide whether a second plaintiff organization had standing since our affirmative conclusion as to one "is a sufficient predicate for federal jurisdiction . . . where . . . multiple parties seek the same relief." *Centro*, 868 F.3d at 109. We accordingly allowed a one-member "unincorporated membership organization" to remain in the lawsuit, notwithstanding that it had "no charter, no bylaws, no bank accounts, no funding, [and] no expenditures." *Centro*, 868 F.3d at 119 (Jacobs, *J.*, dissenting). It would seem that an individual Boy Scout at the crossing would have Article III standing, provided of course that he constitutes himself a "task force."

5

In sum, I respectfully decline to join Part II.C of the majority opinion.

CARNEY, *Circuit Judge*, concurring in part and dissenting in part:

I join the Majority's Opinion in all components but one: I respectfully dissent from my colleagues' ruling that the zone-of-interests doctrine precludes Youth Ministries for Peace and Justice, Inc. ("YMPJ") from stating a claim under the Administrative Procedure Act (the "APA") for agency violations of 8 U.S.C. § 1423(b)(1).

As I explain below, YMPJ's organizational interest in eliminating unlawful obstacles to naturalization falls within the zone of interests to be protected or regulated by § 1423(b)(1), a provision of the Immigration and Nationality Act (the "INA") that excuses naturalization applicants with mental or physical disabilities from passing certain English and civics tests that otherwise are prerequisites for naturalization. The zone-of-interests test erects only a low hurdle for a plaintiff invoking the APA to hold agencies accountable for their statutory obligations. *See Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012) ("*Match-E*"). As the Supreme Court emphasized in *Match-E*, "[w]e apply the test in keeping with Congress's evident intent when enacting the APA to make agency action presumptively reviewable." *Id.*[1] YMPJ has satisfied this permissive standard. In concluding otherwise in Part II(D)(1), the Majority draws on legal principles that have no place in the zone-of-interests inquiry. Accordingly, I would vacate the District Court's judgment insofar as it dismissed YMPJ's APA claim against the United States Department of Homeland Security ("DHS"), the United States Citizenship and Immigration Services ("USCIS"), and their respective agency heads (collectively, "Defendants").

---

[1] Unless otherwise noted, I omit all alterations, citations, footnotes, and internal quotation marks from quoted text.

The zone-of-interests test is a "tool for determining who may invoke [a statutory] cause of action." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 130 (2014). It asks whether those "interests" that a plaintiff seeks to protect—*i.e.*, the plaintiffs' interests in avoiding or remedying the injuries alleged—"fall within the zone of interests protected by the law invoked." *Bank of Am. Corp. v. City of Miami*, 137 S. Ct. 1296, 1302-03 (2017).[2] Although courts traditionally viewed the zone-of-interests doctrine as part of the "prudential branch of standing," the Supreme Court recently clarified in *Lexmark* that the doctrine has no jurisdictional import. 572 U.S. at 126-27. Instead, it "requires [courts] to determine, using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim." *Bank of Am. Corp.*, 137 S. Ct. at 1303.

Here, YMPJ invokes § 102 of the APA: the "general cause of action [for] persons 'adversely affected or aggrieved by agency action within the meaning of a relevant

---

[2] As I discuss at length *infra* in Part II(B), the zone-of-interests test discerns a plaintiff's "interests" in the litigation directly from the injury to the plaintiff that it alleges is threatened by defendants' acts. *See, e.g.*, *Bank of Am. Corp.*, 137 S. Ct. at 1303 ("To use the language of *Data Processing*, the City's claims of injury it suffered as a result of the statutory violations are, at the least, *arguably* within the zone of interests that the FHA protects." (emphasis in original)); *Lexmark*, 572 U.S. at 137 (concluding that "[t]here is no doubt that it [*i.e.*, the named plaintiff] is within the zone of interests protected by the statute" because the plaintiff's "alleged injuries—lost sales and damage to its business reputation—are injuries to precisely the sorts of commercial interests the Act protects").

statute.'" *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 345 (1984) (quoting 5 U.S.C. § 702).[3] YMPJ alleges that Defendants' ongoing violations of the INA adversely affect YMPJ.

To satisfy the zone-of-interests test as it applies to such an APA claim, a plaintiff must show that its alleged "harm" (*i.e.*, the source of its "asserted interests") falls "*arguably* within the zone of interests to be protected or regulated by the statute that [it] says was violated," *Match-E*, 567 U.S. at 224 (emphasis added)—that is, the zone of interests of what I will refer to as "the predicate statute," which in this case is the INA. In keeping with "Congress's 'evident intent' when enacting the APA 'to make agency action presumptively reviewable,'" the test "is not meant to be especially demanding." *Id.* at 225 (quoting *Clarke v. Securities Industry Assn.*, 479 U.S. 388, 399 (1987)). It "forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the [predicate] statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Id.* In applying this standard, "the benefit of any doubt goes to the plaintiff," as the Supreme Court reinforced by "always conspicuously includ[ing] the word 'arguably'" in the test. *Id.* This approach "preserv[es] the flexibility of the APA's omnibus judicial-review provision, which permits suit for violations of numerous statutes of varying character that do not themselves include causes of action for judicial review." *Lexmark*, 572 U.S. at 130.

In my view, YMPJ's APA claim for agency violations of § 1423(b)(1) easily satisfies this flexible standard. In bringing suit, YMPJ seeks to protect what it terms as its "primary mission" of helping eligible immigrants in the South Bronx to become naturalized citizens. App'x 58, 65. According to the complaint, YMPJ suffers an injury

---

[3] Section 102 of the APA provides in relevant part that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702.

separate from that of its clients: Defendants impede YMPJ in fulfilling its mission by arbitrarily denying disabled applicants' legitimate requests to be excused from meeting certain knowledge-testing requirements otherwise demanded of applicants. YMPJ alleges in particular that it must divert time and resources towards tearing down Defendants' "unlawful discriminatory barriers"—time and resources that YMPJ could have spent on other clients and other activities consonant with its mission. App'x 28, 59-60, 65, 67. As the Majority Opinion correctly reasons in Part II(C), *supra*, this alleged impediment to fulfilling YMPJ's organizational mission constitutes "'far more than simply a setback to [YMPJ's] abstract social interests.'" Maj. Op., *supra,* at 18 (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)). Instead, it represents a cognizable Article III injury to YMPJ as an organization because YMPJ must "spen[d] money to combat activity that harms its organization's core activities." *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 111 (2d Cir. 2017) ("*Centro*").

YMPJ's asserted injury is sufficiently related to the "purposes implicit" in § 1423(b)(1) to satisfy the zone-of-interests test for APA claims. *Match-E*, 567 U.S. at 225. It is apparent from the statute's text that, in enacting this statutory provision, Congress intended to protect the interests of eligible disabled immigrants in obtaining U.S. citizenship, as the Majority seems to accept in acknowledging that disabled naturalization applicants are proper plaintiffs here. *See* Maj. Op., *supra*, at 28 n.12 ("Congress has already designated naturalization applicants as the proper plaintiffs to sue."). The interests of those individuals, however, mirror YMPJ's own interests in defending its ability to carry out its organizational mission of helping eligible immigrants obtain U.S. citizenship. *See Fed. Defs. of New York, Inc. v. Fed. Bureau of Prisons*, 954 F.3d 118, 131 (2d Cir. 2020) ("*Federal Defenders*") (public defenders organization satisfied the zone-of-interests test for APA claims because its interest in

4

accessing inmates "mirror[ed]" the inmates' interests in accessing their attorneys).[4] Indeed, according to the plausible allegations in the complaint, whenever one of YMPJ's disabled clients is unlawfully deprived of the protections of § 1423(b)(1), YMPJ is injured correspondingly—and independently—because that deprivation increases YMPJ's economic costs of pursuing its "noneconomic interest in encouraging a particular policy preference"—*i.e.*, the naturalization of eligible immigrants. *Nnebe v. Daus*, 644 F.3d 147, 157 (2d Cir. 2011). Thus, although YMPJ and its clients suffer separate and distinct harms as a result of Defendants' alleged statutory violations, the tight nexus between their injuries is undeniable.

The interests that YMPJ seeks to protect in this litigation are also more than marginally related to "Congress's purpose of streamlining the naturalization process"— a statutory objective that the Majority and I agree bears on the correct zone-of-interests analysis in this case. Maj. Op., *supra*, at 27. In 1990, Congress reformed the nation's naturalization system by, among other things, shifting oversight of the naturalization process from the federal courts to USCIS. *See Bustamante v. Napolitano*, 582 F.3d 403, 409-10 (2d Cir. 2009). As we have explained elsewhere, a "central purpose" of this reform "was to reduce the waiting time for naturalization applicants." *Chan v. Gantner*, 464 F.3d 289, 290 (2d Cir. 2006). By transferring primary responsibility for naturalization to an executive agency, Congress sought to eliminate the substantial backlog of naturalization applications that had accumulated in the federal judiciary. *See Bustamante*, 582 F.3d at 410.

YMPJ's alleged injury therefore implicates the very concerns of delay and inefficiency that motivated Congress to replace the courts with Defendants as

---

[4] As I argue below in Part II(B), and as the Majority disputes, the APA claim asserted in *Federal Defenders* and that raised by YMPJ are materially indistinguishable for purposes of applying the zone-of-interests test.

superintendents of the naturalization process. Taking the factual allegations of the complaint as true, as we must at this stage of the litigation, Defendants' unlawful practice of arbitrarily denying disability waivers has delayed the naturalization process, requiring YMPJ to spend more time and resources helping its eligible disabled clients become citizens. App'x 28, 59-60, 65, 67. Accordingly, YMPJ's asserted injury—the money lost and time wasted helping disabled applicants overcome unlawful barriers to naturalization—is closely entwined with Congress's "goal of 'allow[ing] citizenship to be more expeditiously provided to those who qualify.'" *Bustamante*, 582 F.3d at 410 (quoting, in parenthetical, 135 Cong. Rec. H4539-02 (July 31, 1989) (statement of Rep. Morrison)).

Two additional observations reinforce the conclusion that YMPJ's interests in this litigation at least arguably falls within the zone of interests to be protected or regulated by § 1423(b)(1). The first derives from "the 'overall context' of the INA and its naturalization scheme"—context that, as the Majority Opinion duly acknowledges, must inform our zone-of-interests inquiry here. Maj. Op., *supra*, at 22 (quoting *Bennett v. Spear*, 520 U.S. 7 154, 175-76 (1997), and *Clarke*, 479 U.S. at 401). In designing the INA, Congress indisputably envisioned a role for private non-profit organizations in helping immigrants navigate the naturalization process. To that end, § 332 of the INA, which deals generally with the administration of the naturalization program, directs the Attorney General to "seek the assistance of appropriate community groups, private voluntary agencies, and other relevant organizations" in educating immigrants about "the benefits [of naturalization] . . . and the requirements to obtain such benefits." 8 U.S.C. § 1443(h).

Notably, the statutory reliance on nongovernmental organizations to aid immigrants is not unique to the INA's naturalization program, but rather embodies a broader congressional strategy of harnessing the expertise and resources of civic groups

6

to advance its objectives in enacting the INA and the statute's administration. For example, the statute requires the Attorney General to provide asylum applicants and aliens subject to deportation proceedings with a list of attorneys who are willing to provide counsel on a pro bono basis. *See id.* § 1158(d)(4)(B) (asylum); *id.* § 1229(b)(2) (deportation). In a similar vein, it directs the Attorney General to refer applicants for T visas and U visas to "nongovernmental organization[s]" for legal advice. *Id.* § 1101(i)(1) (T visas); *id.* § 1184(p)(3)(A) (U visas).[5] Agency regulations further implement Congress's expectation that civic society will play a role within the immigration system, establishing an accreditation process for "non-profit religious, charitable, social service, or similar organization[s]" that seek to represent clients in immigration courts and proceedings, where non-lawyers are permitted to serve as advocates. 8 C.F.R. §§ 1292.11, 1292.12. As these provisions make plain, not only is YMPJ's organizational mission of helping eligible immigrants to naturalize related to the purposes implicit in § 1423(b)(1); that mission is explicitly promoted by the INA and its implementing regulations.

In addition to being supported by the "context and purpose" of § 1423(b)(1), *Match-E*, 567 U.S. at 226, my conclusion that YMPJ's APA claim satisfies the zone-of-interests test also aligns closely with one of the reasons that animate the doctrine. As the Supreme Court explained in *Clarke*, it aimed in part to "ensure that . . . [an APA

---

[5] T visas provide a temporary immigration benefit to victims of human trafficking in exchange for their assistance in investigating or prosecuting such crimes. U visas provide a similar temporary immigration benefit, also in exchange for law enforcement assistance. *See* USCIS, *Victims of Human Trafficking: T Nonimmigrant Status*, https://www.uscis.gov/humanitarian/victims-of-human-trafficking-and-other-crimes/victims-of-human-trafficking-t-nonimmigrant-status (last updated May 10, 2018); USCIS, *Victims of Criminal Activity: U Nonimmigrant Status*, https://www.uscis.gov/humanitarian/victims-of-human-trafficking-and-other-crimes/victims-of-criminal-activity-u-nonimmigrant-status (last updated June 12, 2018).

plaintiff] would be a reliable private attorney general to litigate the issues of the public interest." 479 U.S. at 397 n.12. Accordingly, when applying the zone-of-interests standard to APA claims, we seek (1) to identify "those [plaintiffs] who in practice can be expected to police the interests that the statute protects," *Federal Defenders*, 954 F.3d at 131, and (2) to "exclude those plaintiffs whose suits are more likely to frustrate than to further statutory objectives," *Clarke*, 479 U.S. at 397 n.12.

As I see it, YMPJ is both well-positioned and highly incentivized to enforce the INA's statutory and regulatory requirements for naturalization, "polic[ing] the interests that the statute protects." *Federal Defenders*, 954 F.3d at 131. To begin with, courts have long recognized that "he who is 'likely to be financially' injured may be a reliable private attorney general." *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 154 (1970) ("*Data Processing*") (quoting *FCC v. Sanders Bros. Radio Station*, 309 U.S. 470, 477 (1940)). Here, YMPJ's alleged injury has a financial dimension: according to the complaint, Defendants' purportedly unlawful activity consumes excessive amounts of YMPJ's limited resources and thereby frustrates its organizational mission. In addition, because YMPJ and other immigrant aid organizations are regular participants in the complex naturalization system, they are better situated than are individual applicants to identify patterns of possible "administrative neglect." *East Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 769 (9th Cir. 2018). This is especially so where, as in this case, the nature of the agency's alleged misconduct is variable. Unpracticed eyes, for example, could easily mistake Defendants' purported unlawful acts—which range from the substantive (ignoring the medical judgments of an applicant's doctor) to the bureaucratic (demanding original documents when photocopies should suffice)—for a series of unrelated incidents, rather than a pattern and practice of unlawful decision-making.

Taken together with the statutory text and context, these considerations convince me that YMPJ's claim under the APA satisfies the zone-of-interests test. Not only are YMPJ's interests in the litigation directly aligned with Congress's goals of protecting disabled applicants and streamlining the naturalization process; those interests also make YMPJ well-suited to serve both as immigrant advocate and private attorney general, fulfilling at once the INA's expectations for nongovernmental organizations and courts' expectations for APA plaintiffs.

## II.

The Majority Opinion advances three main reasons for its conclusion that YMPJ's APA claim fails the zone-of-interests test. First, the Majority proposes that it fails because "Congress has already designated naturalization applicants as the proper plaintiffs to sue." Maj. Op., *supra*, at 28 n.12, 31. Second, it asserts that "YMPJ's interest is entirely 'derivative' of its clients' interests" and thus that it does not suffice to support the claim. *Id.*, *supra*, at 23. Finally, the Majority Opinion warns that allowing YMPJ's claim to proceed under the APA would "render the zone-of-interests test essentially meaningless," implying that it therefore must create a higher bar. *Id.*, *supra*, at 26. I find none of these arguments persuasive. In particular, in developing these proposals, the Majority's analysis appears to borrow from doctrines that are distinct from the zone-of-interest test as usually applied and that, in my view, have no home there.

### A.

In its application of the test, the Majority leans heavily on 8 U.S.C. § 1421, the INA provision that affords unsuccessful naturalization applicants a right to seek judicial review after they exhaust their administrative remedies. Because § 1421 explicitly gives naturalization applicants—but not advocacy organizations—a right to sue, subject to certain exhaustion requirements, the Majority suggests that the zone-of-interests test

9

precludes YMPJ from asserting its APA claim: "it cannot reasonably be assumed that Congress intended to permit YMPJ . . . to bring suit without first exhausting [the INA's] administrative remedies," the Majority reasons, adding that "Congress has already designated naturalization applicants as the proper plaintiffs to sue." Maj. Op., *supra*, at 28 & n.12.

In a zone-of-interests analysis, however, Congress' decision to give some litigants the right to sue under the INA and to impose certain exhaustion requirements on them has no bearing on whether other litigants may sue under the APA for INA violations. This is because—at least in the APA context—the zone-of-interests test does not "require that Congress have specifically intended to benefit a particular class of plaintiffs before a plaintiff from that class . . . [can sue] under the APA." *Nat'l Credit Union Admin. v. First Nat. Bank & Tr. Co.*, 522 U.S. 479, 498 (1998) ("*NCUA*"). Indeed, the test "do[es] not require *any* indication of congressional purpose [in the predicate statute] to benefit the would-be plaintiff." *Match-E*, 567 U.S. at 225 (emphasis added). Nor must a plaintiff identify "[a] separate indication of congressional intent to make agency action reviewable under the APA." *Japan Whaling Ass'n v. Am. Cetacean Soc.*, 478 U.S. 221, 230 n.4 (1986). On the contrary, "the rule is that the cause of action for review of such action is available absent some clear and convincing evidence of legislative intention to *preclude* review." *Id.* (emphasis added). For these reasons, the Supreme Court has previously determined that APA plaintiffs satisfied the zone-of-interests test in cases (1) where the predicate statute did not explicitly reference the plaintiffs or litigants like them, *see, e.g., Clarke*, 479 U.S. at 395; *Data Processing*, 397 U.S. at 155-56; (2) where "Congress did not intend specifically to protect [the plaintiff's class of litigants]," *NCUA*, 522 U.S. at 494; and (3) where "Congress never specifically focused on the interests of [the plaintiffs]," *Clarke*, 479 U.S. at 396 n.10.

10

The Majority's reliance on § 1421 (the INA's right-to-sue provision) to exclude YMPJ's APA action is therefore misplaced.[6] Certainly, this provision reveals Congress's intent to confer a benefit (*i.e.*, the right to sue, contingent upon exhaustion of remedies) upon a particular class of persons (*i.e.*, naturalization applicants) in a particular set of circumstances. The legislature's failure to extend that right to advocacy organizations in the INA, however, is of no moment to the zone-of-interests inquiry for an APA suit. So long as YMPJ's interest in the litigation is "more than marginally related to the purposes implicit in" § 1423(b)(1), *Federal Defenders*, 954 F.3d at 132, its APA claim will satisfy the zone-of-interests test, irrespective of whether Congress "intend[ed] specifically to protect" immigrant advocacy organizations or their interests when it enacted the INA's naturalization program, *NCUA*, 522 U.S. at 494.

B.

The Majority's "derivative interests" argument is also misguided. To satisfy the zone-of-interests test, the Majority urges, YMPJ must have "more than a derivative interest in"—or "altruistic concern for"—"someone else's rights." Maj. Op., *supra*, at 21, 24. This is an uncontroversial proposition, but it is no more than a straw man here. In the Majority's view, YMPJ is merely "interest[ed] in improving the naturalization process for the sake of its clients." *Id.*, *supra*, at 23. To illustrate this point, the Majority posits that "[t]he effect of Section 1423(b)(1)'s disability-waiver process on YMPJ is derived entirely from YMPJ's efforts to assist the disabled naturalization

---

[6] The *expressio unius* principle cannot bear the weight the Majority gives to it here. *See* Maj. Op., *supra*, at 28 n.12, 30. Although it is certainly a familiar tool of statutory interpretation, it "is only an aid to statutory construction, not a rule of law" and offers "an uncertain guide to interpretation." *Brennan-Centrella v. Ritz-Craft Corp. of Penn.*, 942 F.3d 106, 111 (2d Cir. 2019). In light of its recognized "shortcomings," *id.*, it is of doubtful utility in applying the zone-of-interests test to an APA claim, where precedent suggests an active presumption in favor of reviewability. See discussion in Part II(A), *supra*.

11

applicants who are directly regulated by the statute." *Id.*, *supra*, at 25. Because—in the Majority's estimation—an organization cannot "satisfy the zone-of-interests test simply by asserting a derivative interest in helping naturalization applicants to vindicate their rights under a statute," it follows, they say, that YMPJ's allegations are insufficient to state a claim under the APA. *Id.*, *supra*, at 31.

This analysis, however, misconceives YMPJ's "interest," appearing at times to conflate the organization's *interests* in the litigation under the APA with its *legal rights* (or lack thereof) under the INA. A plaintiff's "interests" for purposes of the zone-of-interests inquiry refers to the plaintiff's interests in remedying or avoiding the "injury" that the plaintiff allegedly will suffer or has "suffered as a result of the statutory violations." *Bank of Am.*, 137 S. Ct. at 1303. A plaintiff's "interests" and "injuries" are in other words two sides of the same coin. Accordingly, for APA claims, the zone-of-interests test asks whether a plaintiff's alleged "harm[s]"—or conversely, its "asserted interests" in remedying those harms—are sufficiently related to the purposes of the statute that was purportedly violated. *Match-E*, 567 U.S. at 224-28 (considering the relationship between the predicate statute—the Indian Reorganization Act—and the APA plaintiff's asserted "economic, environmental, and aesthetic harm"); *see also Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 886 (1990) (determining that alleged injuries to the APA plaintiffs' "recreational use and aesthetic enjoyment" fell within the relevant zone of interests of the National Environmental Policy Act and Federal Land Policy and Management Act). An APA plaintiff's *interests* in a litigation are therefore distinct from any legal *rights* that the plaintiff might have under the predicate statute. Indeed, for the reasons I discuss above in Part II(A), a plaintiff's APA claim may satisfy the zone-of-interests test even if the predicate statute does not refer to the class of persons to which the plaintiff belongs.

Properly understood, then, the interests asserted by YMPJ in this litigation—
*i.e.*, "the injury [that it] complains of," the financial and resource expenditures dedicated toward halting the allegedly unlawful agency action that impedes its efforts to fulfill its organizational mission—are not merely altruistic or derivative of its clients' interests. *Lujan*, 497 U.S. at 883; *see also Bank of Am.*, 137 S. Ct. at 1303 (describing the zone-of-interests test as concerning the plaintiff's "claims of injury"). As the Majority correctly concludes, YMPJ plausibly alleges an Article III injury to itself as an organization based on the "'perceptible impairment'" of its ability to fulfill its mission to help eligible immigrants naturalize. Maj. Op., *supra*, at 18 (quoting *Nnebe*, 644 F.3d at 157). This type of organizational injury stands apart from the harm suffered by YMPJ's clients. In fact, it is precisely because YMPJ plausibly alleges an injury to itself that the organization has "standing in its own right to seek judicial relief." *New York Civil Liberties Union v. New York City Transit Auth.*, 684 F.3d 286, 294 (2d Cir. 2012) ("*NYCLU*").

Nor does YMPJ's injury somehow become a less cognizable injury to the organization simply because it is related to YMPJ's efforts to assist its disabled clients. Maj. Op., *supra*, at 25. As we have often repeated, an organization suffers its own "injury-in-fact" when "it spen[ds] money to combat activity that harms its organization's core activities," including in cases where the organization's adversely affected activities were simply services that it provided to clients or members of the community, *Centro*, 868 F.3d at 110-11 (labor organizing); *see also, e.g., Olsen v. Stark Homes, Inc.*, 759 F.3d 140, 158 (2d Cir. 2014) ("fair-housing advocacy and counseling"); *NYCLU*, 684 F.3d at 293, 295 (legal representation of clients in administrative proceedings); *Nnebe*, 644 F.3d at 157 ("counsel[ing]" of "suspended drivers").

The Majority's derivative interests argument stands in stark tension with our recent decision in *Federal Defenders*. *See* 954 F.3d at 131-32. There, the Federal Defenders—"a not-for-profit organization . . . dedicated to offering public defense

13

services to indigent persons in federal criminal cases"—sued the Federal Bureau of Prisons (the "BOP") and one of its wardens, asserting an APA claim that the government violated its own regulations by unreasonably restricting the Federal Defenders' access to inmates housed in a federal facility. *Id.* at 123-24. According to the complaint, these regulatory violations "drain[ed] the Federal Defenders' resources," forcing the organization to spend money and time in responding to BOP's "cancellations and delays of attorney visits" and "impair[ing] . . . [their] ability to represent their clients." *Id.* at 124. The organization sought declaratory and injunctive relief on behalf of itself and its clients.

On appeal from a Rule 12(b)(6) dismissal, we reversed, concluding that this "APA claim f[ell] squarely within the zone of interests to be protected and regulated by the [relevant] BOP regulations on inmate-attorney visits." *Id.* at 131. Taking no issue with the government's characterization of the applicable regulations as "intended . . . to benefit MDC inmates, not their attorneys," we described "the regulations' plain—and critical—objective" as "ensuring that *detainees* ha[d] frequent and predictable opportunities to consult with their attorneys." *Id.* at 131-32 (emphasis added). Nevertheless, we concluded, the plaintiff organization "easily satisf[ied]" the zone-of-interests standard because "[its] interests in having adequate access to [its] clients . . . mirror[ed] the interests that the[] [relevant] BOP regulations s[ought] to protect, namely: the strong interests of [facility] inmates . . . in having adequate access to legal counsel." *Id.*

So too here: YMPJ asserted violations of laws that, on their face, were intended to protect the interests of its clients. *Id.* at 131. And, like Federal Defenders, YMPJ alleged injuries based on a diversion of resources that impaired its ability to provide services to those clients. No more is required to satisfy the zone-of-interests test in an APA action.

14

The Majority posits that YMPJ is more "removed from" § 1423(b)(1) than the Federal Defenders were from the BOP regulations. Maj. Op., *supra*, at 25. It is true that the regulations at issue in Federal Defenders expressly mentioned "attorneys," whereas § 1423(b)(1) does not explicitly mention immigrant aid organizations. But in both cases the involvement of third parties was contemplated by applicable law and, as we recently emphasized in *New York v. United States Department of Homeland Security*, the zone-of-interests test "may be satisfied even if there is no indication of congressional purpose to benefit the would-be plaintiff." 969 F.3d 42, 62 (2d Cir. 2020).[7] And just as (in the Majority's words) the "effect" of § 1423(b)(1) on YMPJ "is derived entirely from [its] efforts to assist the disabled naturalization applicants," so too was the "effect" of the BOP regulations on the Federal Defenders "derived entirely" from the organization's efforts to assist the inmates. *Id.*, *supra*, at 25. Both in *Federal Defenders* and here, the plaintiff organization would not have been injured by the government's

---

[7] The Majority attempts to distinguish our decision in *New York* from the present case, but the import of *New York* is unavoidable and the decision governs here: The zone-of-interests test will not bar a plaintiff's APA claims unless "[the plaintiff's] interests are so marginally related to or inconsistent with the purposes implicit in the [predicate] statute that it cannot reasonably be assumed that Congress intended to permit the suit." *New York*, 969 F.3d at 62. As a result, I respectfully disagree with the Majority that *New York* requires "a broader zone-of-interests inquiry" than that called for here. Maj. Op., *supra*, at 25 n.10. Rather, *New York* reaffirms that a plaintiff can satisfy the zone-of-interests test even if Congress did not articulate an intention to benefit that category of plaintiff. 969 F.3d at 62-63. And, like the relationship between the public-charge statute and other federal immigration laws that we addressed in *New York*—and contrary to the Majority's assertion—§ 1423(b)(1) does in fact function as an exemption from the INA's naturalization requirements, easily justifying reference to other provisions of the INA: § 1423(b)(1) exempts certain disabled naturalization applicants from the standard array of requirements that govern naturalization applicants generally. *Compare New York*, 969 F.3d at 62, *with Air Courier Conference of Am. v. Am. Postal Workers Union AFL-CIO*, 498 U.S. 517, 529-30 (1991) (APA claim for violation of Private Express Statutes was not brought within zone of interests by references to Postal Reorganization Act because the "only relationship between the [regimes]" was that "both were included in the general codification of postal statutes"). Applying the zone-of-interests analysis as we did in *New York* leads to the conclusion here that YMPJ has satisfied that test.

15

alleged misconduct but for its own efforts to fulfill its organizational mission by helping clients who were "directly regulated" by the challenged law and whose interests "mirror" YMPJ's own. *Id*.

YMPJ's claim under the APA thus satisfies the zone-of-interests test.[8]

C.

Finally, seeing YMPJ as "such an indirect beneficiary" of the INA's naturalization program, the Majority warns that allowing its APA claim to proceed would transform the zone-of-interests test into an "essentially meaningless" requirement that "excludes nothing." Maj. Op., *supra*, at 26, 31. In my view, the concern is misplaced. As applied to APA claims that survive an Article III challenge, the zone-of-interests test serves an

---

[8] In making its derivative interests argument, the Majority cites our decision in *Center for Reproductive Law and Policy v. Bush*, 304 F.3d 183 (2d Cir. 2002) ("*CRLP*"), the case that—as the Majority and I agree—mandates dismissal of YMPJ's Due Process claim. In doing so, the Majority urges that *CRLP* also requires dismissal of YMPJ's claim under the APA because *CRLP* did not "cabin[] its reasoning," arguing that the concerns noted in *CRLP* regarding the zone of interests for a Due Process claim "are just as relevant" in the APA context. Maj. Op., *supra*, at 24 n.8. I respectfully disagree. As the Supreme Court observed in *Lexmark*, "[T]he breadth of the zone of interests varies according to the provisions of law at issue," and we have never found the zone of interests covered by the Due Process Clause to be coextensive with the zone of interests covered by the APA's sweeping review provisions. 572 U.S. at 130. Instead, we have highlighted that, "[b]ecause Congress intended to make agency action presumptively reviewable under the APA, that test is not especially demanding in the context of APA claims and may be satisfied even if there is no indication of congressional purpose to benefit the would-be plaintiff." *New York*, 969 F.3d at 62. Moreover, in *CRLP*, unlike here, the plaintiffs "d[id] not assert a harm to their own interest in receiving due process of law." 304 F.3d at 196. Indeed, "their alleged injury" actually "concern[ed] First Amendment interests" and, accordingly, it was apparent that these "d[id] not fall within the zone of interests protected by the Due Process Clause." *Id.* at 186, 196. In other words, we identified a mismatch between the kind of harms alleged by the *CRLP* plaintiffs (First Amendment injuries) and the provision of law under which their claim purportedly arose (the Due Process Clause). Here, by contrast, YMPJ's alleged injury—the impairment of its ability to achieve its organizational mission of helping eligible immigrants to naturalize—is closely related to the purposes underlying § 1423(b)(1), and therefore satisfies the zone-of-interests standard for APA claims.

independent purpose. Properly applied, it would continue to exclude as plaintiffs, for example, organizations whose missions are not related to the purposes of the predicate statute.

This limitation follows directly from the zone-of-interests test itself. As described above, a plaintiff bringing an APA claim must allege injuries that are "more than marginally related to the purposes implicit in [the predicate statute]" to survive the zone-of-interests test. *Federal Defenders*, 954 F.3d at 132. Thus, where—as with YMPJ here—a plaintiff organization's alleged injury is the "perceptible impairment" of its ability to pursue its organizational mission, *Centro*, 868 F.3d at 109, the organization will satisfy the zone-of-interests standard for an APA claim only if its organizational mission is more than marginally related to the purposes implicit in the predicate statute.

To illustrate: If, hypothetically, YMPJ were a for-profit law firm that represented naturalization applicants among other types of clients and sought to pursue claims against Defendants such as YMPJ brings here, it might still be able to allege an Article III injury based on the theory that Defendants' unlawful denials of disability-waiver requests increased YMPJ's costs of representing naturalization applicants—and therefore "harm[ed] [the] organization's core activities." *Id.* at 111. This type of injury, however, would plainly fall outside the zone of interests protected by § 1423(b)(1) because profit maximization has nothing to do with the purposes underlying the INA or § 1423(b)(1). In contrast, YMPJ's actual and long-established mission of naturalizing eligible immigrants *is* closely related to § 1423(b)(1)'s purposes of protecting disabled applicants and streamlining the naturalization process. For that reason, YMPJ's alleged injury in this case falls within the relevant zone of interests and so holding does not, contrary to the Majority's assessment, reduce the zone-of-interests test to a nullity.

One might be concerned about organizations manufacturing a mission statement for purposes of satisfying the zone-of-interests test. This concern is addressed, however,

17

by the rule proscribing "manufactured litigation." *Nnebe*, 644 F.3d at 157. As a general matter, plaintiffs are not permitted to "manufacture [Article III] standing merely by inflicting harm on themselves." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013). Were the rule otherwise, "Article III would present no real limitation." *Spann v. Colonial Vill., Inc.*, 899 F.2d 24, 27 (D.C. Cir. 1990) (Ginsburg, *J.*) Accordingly, if an organization brought suit under the APA, but its mission (as established in its organizational documents, for example) was unrelated to the purposes of the predicate statute, the organization could not salvage its APA claim by inventing a new mission out of whole cloth. Instead, to meet both Article III's injury-in-fact requirement and the zone-of-interests test, the organization would have to identify a mission that was (1) "established," *Centro*, 868 F.3d at 110; (2) "perceptibly impaired" by a defendant's conduct, *id.*, and (3) "more than marginally related to the purposes implicit in" the predicate statute, *Federal Defenders*, 954 F.3d at 132.[9]

In the face of these constraints, the Majority's concerns about the "vitality" of the zone-of-interests test are unfounded and provide neither a doctrinal nor practical basis for affirming the District Court's dismissal of YMPJ's APA claim. Maj. Op., *supra*, at 31.

## III.

Stepping back and situating the Majority's zone-of-interests analysis in the broader doctrinal landscape, I am struck by the ways in which it draws from legal principles that are customarily treated as separate from the zone-of-interests inquiry. In my view, the Majority errs when it looks beyond our zone-of-interests caselaw to support its three main arguments.

---

[9] Nothing in the complaint suggests that YMPJ, which was founded 1994, in any way manufactured its mission statement for the purposes of this litigation.

18

First: In urging that YMPJ has merely "a derivative interest in helping naturalization applicants vindicate their rights under [the INA]," Maj. Op., *supra*, at 31, the Majority focuses on the relationship between YMPJ and the legal rights of a third party (*i.e.*, the naturalization applicants). As discussed above, in my view this line of inquiry has no basis in the zone-of-interests test for APA claims; instead, we examine the relationship between a plaintiff's injuries and the purposes implicit in the predicate statute.

The Majority's analysis does sound a theme, however, that is shared with our doctrine on third-party standing, which generally prohibits a litigant from "raising another person's legal rights." *Lexmark*, 572 U.S. at 126. Like the Majority's derivative interests argument, the third-party standing rule examines the relationship between a plaintiff's own asserted rights and *another* party's legal rights. *See Keepers, Inc. v. City of Milford*, 807 F.3d 24, 38-42 (2d Cir. 2015) (applying the third-party standing bar in the First Amendment context). In contrast to the zone-of-interests test, however, third-party standing doctrine does not concern itself with the *type* of injury allegedly suffered by the plaintiff. *See New York State Citizens' Coal. for Children v. Poole*, 922 F.3d 69, 75 (2d Cir. 2019) (describing the third-party standing rule as "prevent[ing] litigants from asserting *the rights or legal interests* of others simply to obtain relief from *injury* to themselves." (emphasis added)). In light of this difference, the Supreme Court has unsurprisingly continued to recognize the two doctrines as distinct. *See Lexmark*, 572 U.S. at 126, 127 n.3.

Looking next to the Majority's warning that, if we allowed YMPJ's APA suit to proceed, we "would render the zone-of-interests test essentially meaningless" because YMPJ is "such an indirect beneficiary" of the INA's naturalization program. Maj. Op., *supra*, at 26. As explained above, I see the Majority's concern about the "vitality" of the

19

zone-of-interests test as overstated. *Id., supra*, at 31. But it does bring to mind "the rule barring adjudication of generalized grievances." *Lexmark*, 572 U.S. at 126. Indeed, *Haitian Refugee Center v. Gracey*—which the Majority cites in support of its warning—

makes this connection explicit, as I detail in the margin.[10] 809 F.2d 794 (D.C. Cir. 1987). Notwithstanding the *Gracey* Court's opinion, however, the Supreme Court made it abundantly clear in *Lexmark* that the zone-of-interests test and the rule against generalized grievances are distinct legal principles that operate in different ways, the former addressing whether a plaintiff has stated a cause of action, and the latter concerning whether a plaintiff has satisfied the constitutional requirements for standing. *Lexmark*, 572 U.S. at 127 n.3, 128.

Finally, turning to the Majority's reliance on 8 U.S.C. § 1421, the INA provision that expressly gives naturalization applicants a right to sue: Although nothing in our zone-of-interests case law prevents YMPJ from suing *under the APA* simply because its clients can sue *under the INA*, our doctrine of "[i]mplied preclusion" could potentially erect such a barrier. *ACLU v. Clapper*, 785 F.3d 787, 803 (2d Cir. 2015). We have held, in this vein, that another statute's right-to-sue provision may preclude an APA claim

---

[10] The Court in *Gracey* reasoned (in my view, mistakenly, in the context there presented):

> If any person or organization interested in promoting knowledge, enjoyment, and protection of the rights created by a statute or by a constitutional provision has an interest that falls within the zone protected or regulated by the statute or constitutional provision, then the zone-of-interest test is not a test because it excludes nothing. Indeed, such a reading would mean that this court ignores the Supreme Court's decisions that persons who have only a "generalized grievance" about the way in which government operates do not have standing.

*Gracey*, 809 F.2d at 813; *see also id.* at 820, 828-30 (Edwards, *J.*, dissenting in part).

20

when "the government . . . demonstrate[s] by clear and convincing or discernible evidence that Congress intended to preclude review [under the APA] in these particular circumstances." *Id.* at 804.

As with third-party standing and generalized grievances, however, the principle of implied preclusion developed and exists separate from the zone-of-interests inquiry. The two operate in different ways: the zone-of-interests test requires an APA plaintiff to show that its "interests in the litigation are simply more than marginally related to the purposes implicit in the law or regulations invoked," *Federal Defenders*, 954 F.3d at 132; the test for implied preclusion requires a defendant to carry the "heavy burden" of overcoming "the strong presumption that Congress intends judicial review of administrative action." *Clapper*, 785 F.3d at 803. Courts have, moreover, tethered the two doctrines to different parts of the APA. *Compare, e.g.*, *Clarke*, 479 U.S. at 395 (describing the zone-of-interests test as "a gloss on the meaning of § 702"), *with Cmty. Nutrition Inst.*, 467 U.S. at 345 (citing § 701(a)(1) as the basis for its implied-preclusion analysis). In *Data Processing*, for example, the Supreme Court located the zone-of-interests test in § 702.[11] *See* 397 U.S. at 153-54. Having found this test satisfied, it proceeded to address "the remaining question": "whether judicial review of the [agency] action ha[d] been precluded," an inquiry that the Court tied to 5 U.S.C. § 701(a).[12] *Id.* at 156.

In light of these observations, I think that the Majority Opinion incorrectly blurs the lines between the zone-of-interests test and its doctrinal cousins. In doing so, it runs counter to the Supreme Court's efforts in *Lexmark* to untangle the traditional strands of

---

[11] See Dissent, *supra*, at 3 n.3 for the text of APA § 102, 5 U.S.C. § 702.

[12] Section 701(a) limits judicial review under the APA "to the extent that . . . (1) statutes preclude judicial review; or . . . (2) agency action is committed to agency discretion by law." 5 U.S.C. § 701(a).

prudential standing and to clarify the nature and function of the zone-of-interests test. *See* 572 U.S. at 125-28. We should take care not to confound the doctrines again.

Thus, because YMPJ's claim under the APA for violations of the INA satisfies the specific—and "lenient"—requirements of the zone-of-interests test, *id.* at 130, I would vacate the District Court's judgment insofar as it dismissed that claim, and remand for further proceedings.

\* \* \*

For these reasons, I respectfully dissent from Part II(D)(1) of the Majority Opinion.